THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
THOMAS RYAN, Appellant.

Second Department, December 1, 1986

### APPEARANCES OF COUNSEL

*Robert H. Skigen (Charles M. Newell* of counsel), for appellant.

*Patrick Henry, District Attorney (Mark D. Cohen* of counsel; *Richard Gabriel* on the brief), for respondent.

### OPINION OF THE COURT

MOLLEN, P. J.

The murder convictions challenged herein arise out of the defendant's involvement along with three friends in the killing of John Pius, a 13-year-old youth, on April 20, 1979. The defendant's accomplices in the murder, Peter and Michael Quartararo and Robert Brensic, were similarly convicted of murder in the second degree in separate trials. Each of these convictions were upheld on appeal *(see, People v Quartararo,* 113 AD2d 845; *People v Brensic,* 119 AD2d 281). Although several of the issues raised by the defendant closely parallel those raised in accomplice Robert Brensic's appeal, an independent review of the facts as adduced at the defendant's trial is warranted.

## A. *The People's Case*

On the evening of April 20, 1979 between the hours of 7:00 and 8:00 P.M., John Pius, a 13-year-old youth, was repairing his bicycle in the garage of his family's residence in Smithtown, New York. At approximately 8:15 P.M., Pius asked permission from his father to ride over to the nearby Dogwood Elementary School in order to test his newly repaired bike. Pius expected that his friend, Eddie Pembroke, would be at the school. Mr. Pius allowed his son to go to the school grounds but instructed him to return within 15 minutes. At about 8:30 P.M., Pius was observed on his bicycle riding in the direction of the Dogwood School.

When Pius failed to return home by 9:15 P.M., Mr. Pius drove to the school. After walking around the school grounds, Mr. Pius canvassed the neighborhood but was unable to locate his son. Thereafter, Mr. Pius returned home and notified the police that his son was missing. The police arrived at the Pius home at about 11:00 P.M.

### *Discovery of Pius' Body*

At 4:00 A.M. the following day, Mr. Pius telephoned Eddie Pembroke and requested that the youth show him the tree house which Pius and Eddie had been building across the street from Pembroke's home. Their search of that location proved futile.

Later that morning, Mr. Pius and several neighbors conducted a search of the Dogwood schoolyard. At approximately 10:00 A.M., two neighborhood youths who had been playing in the schoolyard discovered Pius' bicycle and his wallet in a wooded area of the yard. Pius' bicycle, which was lying on its side, was not disturbed. Pius' wallet was turned over to a baseball coach who was on a nearby ball field. The coach subsequently contacted Mr. Pius by telephone and informed him that his son's wallet had been found. After retrieving the wallet from the coach's home, Mr. Pius returned to the schoolyard with several relatives and neighbors to conduct a further search of the school grounds. During the search Mr. Pius' niece spotted Pius' bicycle lying on the ground underneath some leaves. Mr. Pius then picked the bicycle up and leaned it against a nearby tree stump.

At approximately 1:40 P.M., Joseph Sabina discovered Pius'

body covered with leaves and branches lying on the ground in a wooded area of the schoolyard. A log covered Pius' head and another log was over his legs. Sabina moved the logs away from the body and then notified Mr. Pius of his discovery.

The police arrived at the scene at 2:30 P.M. Detective Thomas Gill of the Suffolk County Police Department's Homicide Squad, who had responded to the scene, inspected the body and observed drag marks in the dirt emanating from the area of the tree stump where Pius' bicycle rested. The detective then conducted interviews of several persons who were present at the scene, including Sabina who described his observations upon discovering the body. When Sabina informed Detective Gill that he had moved the log which had been covering the decedent's upper body, the detective instructed him to keep confidential the information concerning the condition of the body.

Members of the Medical Examiner's office also responded to the scene later that afternoon. Various items were collected from the immediate vicinity of the body and footprint cast impressions of several prints around the body were taken. The autopsy conducted on Pius' body later that day revealed that six stones had been placed in the youth's mouth, five above the tongue and one below the tongue, which blocked the air passages. In addition to multiple bruises to the body, there were sneaker marks on Pius' cheek and hemorrhaging in the gums which were determined to be consistent with someone standing on the decedent's throat, forcing his mouth open and placing rocks in his mouth. The cause of death was attributed to a combination of asphyxia and multiple contusions and lacerations in and about the chest and neck area. The time of death was estimated between 12 and 24 hours earlier.

### Initial Police Investigation

During the first several days of the investigation into Pius' death, the police concentrated their efforts on three local youths, namely, John Sparling, Michael O'Neil and Raymond St. Dennis, who had been observed in the vicinity of the Dogwood School on the night in question. O'Neil and Sparling were first questioned by police on April 22, 1979, two days after the killing, and at that time both denied being at the schoolyard on April 20, 1979. During subsequent interviews with O'Neil and Sparling, however, the police discovered that both youths, along with St. Dennis, had been at a local beer

distributorship on the evening in question between 7:30 and 8:00 P.M. The boys purchased a case of beer and while the three boys were outside the store, they observed the defendant drive up to the store in a yellow Capri automobile. Michael and Peter Quartararo and Robert Brensic were also in the car. O'Neil and his two friends walked over to the car, spoke with defendant and sold him a six-pack of beer.

Thereafter, O'Neil and his two friends left the store at about 8:00 P.M. and walked towards the Dogwood School. As they passed by the school at about 8:15 P.M., they observed Ryan's car drive out of the schoolyard. Brensic was on a minibike and was holding onto the side of the car. The car turned right onto Rice Lane and drove away. O'Neil and his friends continued past the schoolyard and stopped at a nearby construction site where they drank beer for several hours. Thereafter, they went to a midnight movie.

The defendant, Michael and Peter Quartararo and Robert Brensic were also questioned by the police during the first several days of the police investigation. They denied being at the Dogwood School on the night of the killing and stated they had been at a baseball game at the high school. The defendant and his companions were not considered suspects in the killing at that time. In fact, the police believed that the defendant and his friends were covering up for O'Neil, Sparling and St. Dennis.

Another local youth, Robert Burke, who had a known history of violent behavior, was also considered a suspect in the murder during the first several days of the Pius investigation.[1] On the morning of April 28, 1979, Detectives Fountain and LaValle were instructed to conduct a surveillance of Burke's residence. The detectives commenced their two-hour surveillance at 8:00 A.M. but no activity was recorded during that time. When the detectives contacted the precinct at 10:00 A.M. they were instructed to conduct a surveillance of O'Neil's home. As they were watching O'Neil's residence, the detectives observed a yellow Capri automobile back out of a driveway down the street at approximately 1:00 P.M. The yellow car passed by the officers and continued down the street. The officers decided to follow the car to determine whether O'Neil was inside. The yellow vehicle eventually pulled into a small

---

1. Burke eventually established an alibi for his whereabouts on the evening of Pius' murder.

shopping center on Route 25A in Smithtown and its occupants, neither of whom were O'Neil, went into a delicatessen.

The detectives then headed back to the O'Neil residence at approximately 1:05 P.M. and while en route they received a radio call from Detective Sergeant Richard Jensen, their supervising officer, instructing them to meet him at the Smithtown High School. At the high school, Detective Fountain informed Jensen that he and LaValle had not seen O'Neil during their surveillance but they did observe a vehicle which matched the description of Ryan's car. Jensen asked the detectives to return to the Route 25A delicatessen to determine whether the defendant was in the car and to request him to speak with the police.

When the detectives returned to the shopping center, they observed the yellow Capri drive out of the parking lot and turn onto Woodlawn Avenue. The car stopped at a traffic light and Fountain pulled up alongside the Capri, identified himself as a police officer, and asked the driver to pull over. When the two vehicles stopped, Fountain got out of his car and walked up alongside the driver's side of the Capri. Meanwhile, La-Valle radioed Jensen and informed him of their location. LaValle then exited his vehicle and approached the Capri as a youth, who was later identified as Peter Quartararo, was getting out of the front passenger door. The driver of the car was identified as the defendant.

Jensen, accompanied by Detective Gary Leonard, arrived at the scene within minutes. Jensen introduced himself to the two youths and asked if they would accompany the police officers to the precinct to be interviewed in connection with the ongoing investigation into the Pius murder. Both youths voluntarily agreed although the defendant voiced concern about leaving his car on the street unattended. Jensen suggested that the car be driven to the precinct by Leonard. The defendant agreed and gave Leonard his car keys.

The defendant then accompanied LaValle and Fountain to the Suffolk County Police Department's Homicide Squad in Hauppauge. Quartararo, then 15 years old, was transported to the Fourth Precinct's Juvenile Aid Station by Jensen.

The defendant arrived at the Homicide Squad office at approximately 1:45 P.M., at which time he was introduced to Detectives Thomas Gill and Richard Reck and escorted into an office. At the outset, the defendant was informed that the police were seeking his assistance in the Pius murder investi-

gation. The defendant was also told that he was free to leave at anytime. During the first portion of his interview, the defendant stated that on the evening of the murder, he, Brensic and the Quartararos were at a baseball game at the high school. Upon the defendant's suggestion that Brensic could verify his statement, the police made arrangements to locate Brensic and seek his cooperation. When Brensic arrived at the precinct, Detective Gill spoke with him in a separate room.

The defendant was then advised by Reck that O'Neil had informed the police that the defendant and the Quartararos were in the defendant's car towing Brensic on a minibike at the Dogwood School the night Pius was killed. According to Reck, the defendant responded: " 'Let me tell you the truth.' I said, 'Sure, Go ahead. Why didn't you explain it to me in the first place?' He said, 'Well, I was afraid we'd get into trouble about the mini-bike.' I said, 'What do you mean?' He said, 'That night, we were at the beer depot around eight o'clock and we went up to the school, and Brensic had stolen the mini-bike. I did tow him alongside my car. We made a turn onto Rice Lane and put the mini-bike into the trunk of the car. We then drove home to the Quartararos' house, put the bike in the Quartararos' house and then I went home.' "

During the course of the defendant's interview, at approximately 3:20 P.M., he was permitted to go to the bathroom unattended. When the defendant returned to the room, Reck reviewed the defendant's statements with him. At 4:30 P.M., Detective Jensen called Reck out of the room and spoke with him about the progress of the police interview with Peter Quartararo. When Reck returned to the defendant in the interview room, the following ensued: "I walked back into the room to talk to Tommy Ryan. I said to him 'Tommy, I have some bad news for you' and he said, 'What?' and I said, 'Before I start explaining to you what the problems are, I'm going to have to advise you of your rights' and he said to me 'Why?' and I said, 'Because somebody had just told us that it's you and Brensic, not O'Neil, that killed Pius' and he said, he denied it and said, 'It had to be O'Neil because Pius passed me while we were parked on Rice Lane and heading back to the school.' I said, 'Before we discuss it, I'm going to have to advise you of your rights' and I did that."

After being fully advised of his *Miranda* rights, the defendant agreed to speak to Reck without an attorney present because he "wanted to explain the story" and "get it all

straightened out". Shortly thereafter, Reck was called out of the room again by Jensen and when he returned, Reck informed the defendant as follows: "I told him that somebody who has direct knowledge of his involvement has just told us that 'that night after you stole the bike, Brensic stole the mini-bike, that you towed the bike down towards Rice Lane, as you got onto Rice Lane, the tire became flat. That you were putting the bike into the trunk and Pius was passing by. Somebody in the car made a remark to Pius; you got in the car, you drove to the Quartararo house, en route, you and Brensic discussed the fact that Pius was going to squeal on you and you had to go back and shut him up. You got back to the Quartararo house, dumped the bike off in the garage, drove back to the school and you got to the school, Pius was on the front side of the school, you and Brensic got out, chased him around the school, about ten minutes later, you came back sweating, puffing and you told the people that you had just killed Pius and buried him under some logs and leaves.' " In response, the defendant stated, "That's not quite true. I'll tell you the whole story. The true story". According to Reck, defendant then stated: " 'It was true that the mini-bike was stolen. They had towed it around Rice Lane. The bike had developed a flat. That Pius was passing by. As they were putting the bike in the trunk and it was Michael Quartararo who made a remark to Pius.' I asked him why it was Michael Quartararo and he said, 'Because Michael Quartararo hated Pius' guts. Because they had a couple of fights.' He said, 'We did drive back to Quartararo's house. En route, we did discuss shutting up Pius. We put the bike in the Quartararo's house. We drove back to the school. I looked around the school with Brensic for Pius, but we couldn't find him.' "

The defendant indicated that he arrived home at approximately 9:00 P.M. that evening. Reck then questioned the defendant as follows:

"I asked him how long it took for him to go from Rice Lane to the Quartararos' house. He said about two or three minutes. I asked him if it took about the same time to get back to the school and he said yes. I asked him how long he took looking for Pius and he said two or three minutes.

"I told him 'well, you're talking anywhere from six to ten minutes of your time. We know Pius was up on the school area at 8:15. You told me you got back at nine o'clock. What happened to the other thirty, thirty-five minutes?' He answered that question with a question of his own * * * He

asked me *'what would happen to the kids that killed Pius'* and I asked him 'why did you say kids and more than one' and he told me that's the way he framed the question" (emphasis added).

The defendant never offered any explanation as to the discrepancies in the times.

Throughout the questioning, defendant denied killing Pius. When asked at approximately 6:15 P.M. if he would give the police a written statement concerning what he had already told Reck, the defendant said that he would not sign a statement if it had Pius' name on it. Accordingly, Reck prepared a written statement which incorporated a recitation of the defendant's rights, his pedigree and a short version of the fact that the defendant was at the Dogwood School on the evening of the killing with the Quartararo brothers and Brensic and that they had stolen the minibike. The defendant voluntarily signed the statement at about 6:45 P.M. and was released from custody later that evening.

### Post-April 1979 Admissions by Defendant

Ann Erickson, who had been dating the defendant in 1981, testified as to several comments made by him concerning his role in the Pius killing. In late March 1981, the defendant and Erickson had spoken about his activities on the evening of April 20, 1979. At that time, the defendant stated that he had been at the Dogwood School in the early evening and thereafter went to the Quartararo house where they stayed all evening. The defendant also indicated that they had taken a minibike during the evening; however, he denied seeing Pius that night.

In May 1981, the defendant told Erickson that he was afraid for Peter Quartararo and that he was afraid that he was going to be next. One month later, in June 1981, while the defendant and Erickson were at Central Park in New York City, he related that, "we never missed a weekend at the elementary school" in response to Erickson's comment about teen-agers hanging out in parks and parking lots.

Erickson testified that in early July 1981, she and the defendant had the following conversation in front of Ryan's home: "He told me that he was very scared and he didn't want me to end up like Peter Quartararo's girlfriend, Mickey * * * because now, Peter was gone and she didn't have anyone, and I told him that it didn't matter to me, and, you

know, I would help him in any way I could. And he said—hmm—he said, 'Well, you can help me.' And I said, 'Well, I can try, because I really care about you and I love you' and he said, 'No, you don't and I said, 'Yes, I do.' I said, 'Don't tell me how I feel. Don't try to shut me out' and he said, *'You can't love someone that took someone else's life'* " (emphasis added).

The defendant also expressed the fear that he was going to jail.

Finally in August 1981, the defendant met Erickson at a local pub and asked to speak with her. Erickson indicated that the defendant appeared drunk, so she drove him home. While in the car, the defendant told Erickson that he trusted that she would not say anything to anyone about his prior statements.

### The Defendant's Arrest

On October 23, 1981, Detectives John Miller, Gary Leonard and Michael Ryan and Detective Sergeant Jensen went to the Cousins Two Restaurant located in Lake Grove for the purpose of executing an arrest warrant against the defendant which charged him with the murder of John Pius. When the defendant, who was a waiter at the restaurant, was approached and advised that he was under arrest for murder, he asked another employee to call his attorney. The defendant was then escorted outside to a police car and was placed in the rear seat of the vehicle with Detective Miller. While en route to the precinct, the defendant asked if he could ask a question. When Miller said yes, the defendant inquired, "Was it Ann?".

### Peter Quartararo's Confession

During the course of the trial, the prosecution sought to introduce a confession made by Peter Quartararo while in at the police precinct on April 28, 1979.[2] Peter Quartararo had been called as a prosecution witness but when questioned about his confession, Quartararo invoked his 5th Amendment right against self-incrimination. In view of Quartararo's unavailability, the prosecution sought to introduce the contents of

---

2. A similar evidentiary request was made in Robert Brensic's trial and following a *Settles* hearing *(People v Settles,* 46 NY2d 154) the court determined that Peter Quartararo's statement qualified under the declaration against penal interest exception to the hearsay rule and was thus admissible. On appeal, this court affirmed Brensic's murder conviction *(People v Brensic,* 119 AD2d 281).

Quartararo's confession through the testimony of his interrogating officer, Detective Anthony Palumbo. The prosecution argued that this testimony was admissible under the declaration against penal interest exception to the hearsay rule. Following the prosecution's evidentiary offer, the court conducted a hearing, out of the presence of the jury, to review Palumbo's testimony. At the conclusion of the hearing, the court determined that Palumbo would be permitted to testify as to Quartararo's confession. The court explained: "I am going to permit the testimony of Det. Palumbo in a redacted fashion, and you have to instruct him, if and when he testifies, that there will be no mention at all of anybody but Peter Quartararo in that statement when he discusses—where he told us, out of the presence of the jury, that certain people did certain things, he's not to mention one person's name, because once he does we have a mistrial on our hands". Moreover, prior to Palumbo's trial testimony, the court gave the following instruction to the jury:

"Members of the jury, you're about to hear a statement which the officer is going to tell you about, I believe. I am instructing you now that that statement is being received for a limited purpose only.

"The statement is not being received on the question of the guilt or innocence of this defendant.

"So, if this statement were the only evidence of any guilt of this defendant, if you thought it had anything to do with the defendant at all and it were the only evidence, you would have to acquit the defendant of these charges.

"However, it is to be used for you, if you wish to use it, on the question of credibility. That is, I'm going to instruct you later on when I instruct you in my final instructions to you on the law. I'm going to instruct you as to credibility, but I'm telling you now that this statement is only to be used on the question of credibility. That is, to test the credibility of the two of the People's witnesses and that would be Ann Erickson and Detective Reck.

"So everybody with me?

"It cannot be used as direct evidence of the guilt of the defendant, if it were the only evidence. If you thought it had anything to do with the defendant at all. If it were the only evidence, he would have to be acquitted.

"You can only use it to test the credibility of the other witnesses in this case".

These instructions were later repeated to the jury in the court's final charge; however, at that time, the court also stated that the confession could be used "to corroborate the testimony of other witnesses in this case".

Detective Palumbo testified that on April 28, 1979, he reported to the Juvenile Aid Service Office at the Fourth Precinct at about 2:15 P.M. and was introduced to Peter Quartararo. Detective Palumbo, together with Detective Leonard, commenced interviewing Quartararo in connection with the Pius murder investigation shortly thereafter. During the course of the interview, Quartararo accompanied the detectives to the Dogwood School. On their way back to the precinct, the detectives stopped at a local McDonald's restaurant and purchased some food for Quartararo. Palumbo also tried to contact Quartararo's mother by telephone but was unsuccessful. Mrs. Quartararo was finally contacted by telephone when the detectives and Quartararo returned to the precinct. Mrs. Quartararo arrived at the precinct with her son Michael at about 8:30 P.M.

At that time, Mrs. Quartararo and her two sons were advised of their *Miranda* rights, after which Michael was escorted out of the room. After waiving his rights in the presence of his mother, Quartararo was asked to tell his mother exactly what he had told the detectives earlier. Detective Palumbo related Quartararo's statement as follows:

"He said that on the weekend prior, he had been driving around with three other people in an automobile and that he and these three other people had came upon some other people that they knew at this Beer Barn located on the Jericho Turnpike in Smithtown. In fact, he said that he and his—the three other people that he was with, purchased two six packs of Miller beer from these other boys.

"Q Did he indicate who the other individuals were?

"A Yes, he did.

"Q Would you tell us the names?

"A Three boys by name, O'Neil, Sparling and St. Dennis. It is O'Neil, Sparling and St. Dennis that they bought the beer from.

"He said that upon buying the beer after the bought the beer, they drove to a housing development called Point of Woods, and that they parked the car.

"Peter indicated that they went there with the intention of

stealing a mini-bike. That another person knew of on their paper route.

"He said that he and two other people remained on the street while the third person left to go steal the automobile—I'm sorry, to go steal the mini-bike.

"While waiting for this other person to return, three boys on skateboards began skateboarding up and down the street, near where they were waiting.

"Peter went on to say that he and the two other people that he was with became nervous and left that area and drove into the Dogwood Elementary School, which abuts the property of the Point of Woods development.

"Peter said that a short while later, the person that went to steal the mini-bike came up through * * * the path that led from the Point of Woods to the school, and that the other person with the mini-bike hooked onto or held onto the side of the automobile, and that they—he and the three other people now drove out of the Dogwood Elementary School property.

"He indicated or he said that they went, as they left the Dogwood Elementary School property, in fact, they saw the same boys that they bought the beer from, O'Neil, Sparling and St. Dennis, coming onto the school property from an opposite direction that they were on.

"He said they left the school property still with this other person holding onto the side of the car drove onto Rice Lane and immediately upon turning onto Rice Lane, stopped so that the mini-bike could be put in the trunk.

"Peter indicated that while two other people were putting the mini-bike in the trunk, a third person—at this point, they noticed John Pius going by on his bicycle—excuse me—and while two other people were putting the mini-bike in the trunk, the third person yelled to John Pius as he was going by, 'Pius, you dick.'

"He went on to say that he and the three other people he was with decided to stash the mini-bike in his garage; this is Peter Quartararo's garage, and that they drove to the Quartararos' house and that they put the mini-bike in his garage.

"He went on to say that while they were at his home, one of the other people said that 'Pius saw us with the mini-bike; we got to go back and shut him up.'

"He went on to say that he and the three other people went back to the school, drove onto the property—drove onto the

property, and while making a turn through the bus circle, as he referred to it, they spotted John Pius pedaling his bicycle across the front of the school, headed towards the far side.

"He indicated that they stopped the car, that he and these three other people got out and chased John Pius around the side of the school building.

"He said that one of the other people caught up to John Pius and knocked him off his bicycle, to the ground.

"He said that one of the other people started telling John Pius about how—they knew Pius had seen them with the mini-bike, and that how John Pius had said, 'I didn't even recognize who you guys were.'

"He went on to say how one of the other people were saying to Pius 'Bullshit. You're going to rat us out' and he went on to say how Pius told him and these other people 'I didn't really care about the mini-bike' and that sort of thing.

"He said with that, they, meaning Peter and these three other people, began fighting with John Pius, that John Pius began kicking and screaming and squirming, and that there came a time when one of these other People said, 'We got to shut him up. Let's shove rocks in his throat', which they did.

"Peter indicated that, in fact, he sat on the boy's chest, on John Pius' chest, and indicated, in fact, to his mother how it was that he had forced the mouth open. Specifically, he indicated that he held the jaw with one hand gripping the lower lips and gum with his fingers and kind of held his nose and pried his mouth open like that (indicating).

"He said they all put rocks in his throat.

"He said there came a time that John Pius quit kicking and screaming and squirming and that one of these other people said that 'We killed him. He's dead' and * * * 'We got to bury him' and that they—decided to put him in the woods to the rear of the school.

"He said with this, two of the other people had grabbed John Pius, one by the legs—by the arms, and they started dragging him around the side of the school towards the rear of the school property. Another one of the—the third of these other people, in fact, pushed John Pius' bicycle to the rear of the school property to a point in fact later on where he just threw it up against the tree. Behind the school.

"Peter indicated that there came a time that John Pius wouldn't slide along the grass and wouldn't slide along the

dirt because they got to a piece of blacktop or macadam that's used for basketball area for the kids in the school.

"He just wouldn't slide, and one of the other people asked Peter Quartararo if he would help carry him.

"He said with that, two other people had the arms and legs. He kind of grabbed him around the waist; around the top of his legs; that area, and they carried John Pius towards the rear of the school property, towards the woods.

"He said there came a time that as they got towards the—closer to the woods, they realized that—that they had put John Pius down to rest.

"Furthermore, he said that when they picked him up to go further on back into the woods, Peter indicated that he noticed John Pius' wallet had fallen out of his pocket and indicated that he hadn't done anything or hadn't done anything or hadn't said anything about it.

"That he just left it there.

"He said eventually he and these three other people decided they would put him in the woods along side of this path, that they dragged him down this path, and that they all buried him by covering him with leaves and sticks and logs.

"Q Did he indicate the number of logs he had put on the body?

"A Yes.

"MR. SKIGEN: Objection. Leading.

"THE COURT: Sustained.

"Q What did he say about the logs he put on the body?

"A He said they put two logs. A quantity of leaves and sticks and, specifically, two logs on top of John Pius' body.

"Q Did he indicate to his mother what occurred after that?

"MR. SKIGEN: Objection.

"MR. KEAHON: And where they went?

"THE COURT: Sustained as to form.

"Q Was there any further conversation?

"A Yes there was.

"He told his mother that after they had buried him, they all drove back to Quartararo's house where they made up a story. He said to tell the cops in case they come to the house.

"Q Alright * * *

"A After Peter made this statement, did Mrs. Quartararo say something to her son? * * *

"WITNESS: Yes, she did.

"Q Did there come a time that Michael Quartararo was brought into the room with his brother, Peter and Mrs. Quartararo?

"A Yes, there was".

Following Peter's statement, Michael was brought back into the room and was asked to tell the police what had happened on the night of the murder. Michael refused. Thereafter, Mrs. Quartararo was given an opportunity to converse privately with her two sons. When the detectives returned to the room, Peter Quartararo stated that his prior statement was a lie which he made up in the hope that he would be released by the police.

It is significant to note that the trial court's determination as to the admissibility of Quartararo's redacted confession was made subsequent to defense counsel's offer into evidence, during his cross-examination of Detective Reck, of a police report made by the detective on April 28, 1979. That report stated, *inter alia:* "At about 1630 hours, the undersigned was advised by Detective Sergeant Jensen that Peter Quartararo has stated that RYAN and BRENSIC killed JOHN PIUS".

On redirect examination of Detective Reck, the prosecutor sought to inquire further on the issue of whether the detective had knowledge from anyone that could place the defendant at the Dogwood schoolyard on the night of the murder. Defense counsel objected to this line of questioning. The court overruled the objection, stating:

"I'm going to only permit him to say, if you ask that question, that Peter Quartararo told him that if he did tell him at a particular time, but on that evening, that he and three other people shoved rocks down the throat of John Pius.

"Again, redacted as in the Brensic trial.

"Quite frankly, Mr. Skigen, I think the door has been opened to a lot of things that I'm not allowing the District Attorney to do at this point, but I have to weigh the opening of the door as against the potential prejudice against this defendant.

"MR. SKIGEN: I had a memorandum of law, if it please the Court, to be presented tomorrow which was going to address itself to the nonconfrontation aspect of the case and, I think that you are ruling now, sir, is in line with the nonconfrontation argument.

"THE COURT: Except, Mr. Skigen, we've almost made the

non-confrontation argument academic. Almost any ruling I had to make on any Quartararo confession [was rendered] academic by virtue of the cross examination of this witness, but again, I say I have to weigh how the door had been opened as against potential prejudice to the defendant * * *

"That's my ruling".

## B. The Defendant's Case

The defendant's parents, Elaine and Bernard Ryan, along with their neighbor, Diane Jepsky, testified concerning their efforts to locate the defendant on April 28, 1979. During the late morning hours of that day, the defendant and his father were at a local boatyard working on their boat. When the two returned home, the defendant offered to go to a local delicatessen and purchase sandwiches for lunch. He left the house in a yellow Capri at approximately 12:30 P.M. Mr. Ryan dozed off in his living room and when he awoke at about 1:30 P.M. he realized that his son had never returned. Mr. Ryan called the area hospitals and the Fourth Precinct but was unable to locate the defendant. When Mrs. Ryan returned home from work at approximately 4:00 P.M., Mr. Ryan drove around the neighborhood in an attempt to locate the defendant.

The Ryans subsequently discovered that both Peter Quartararo and Robert Brensic were also missing, and they decided to file a missing person's report. Police Officer Joseph Bores arrived at the Ryans' residence at approximately 6:00 P.M. and interviewed the Ryans as well as Mrs. Brensic and Mrs. Quartararo, who were also at the house. At the Ryans' insistence, Officer Bores telephoned the precinct and inquired whether the boys were being held. Officer Bores was told that the youths were not at the precinct. Officer Bores left the Ryans' residence at approximately 6:30 P.M.

Thereafter, Mrs. Ryan asked Mrs. Jepsky to accompany her to the precinct to see if they could locate the defendant. Mrs. Jepsky agreed. When the two women pulled into the parking lot of the police headquarters, they were flagged down by Mark Jepsky, Mrs. Jepsky's son, and Tommy O'Neil. The boys informed Mrs. Ryan that the defendant's car was in the precinct's parking lot. At that point, Mrs. Ryan approached a police officer, later identified as Captain Stimpson, who was exiting from his car. Mrs. Ryan told the officer that she was trying to locate the defendant and that she knew that the police were retaining him. Captain Stimpson escorted Mrs. Ryan and Mrs. Jepsky to a nearby building and introduced

them to the desk officer. Mrs. Ryan informed the desk officer that she was attempting to locate the defendant and that his car was outside. In order to assist the officer, Mrs. Ryan offered to go outside and copy down the defendant's license plate number. However, after Mrs. Ryan and Mrs. Jepsky located the defendant's car, they decided to go over to the Homicide Squad building located on the other side of the parking lot.

When Mrs. Ryan, along with Mrs. Jepsky and the two boys, entered the Homicide Squad building, they were met by several police officers who asked them to leave. Mrs. Ryan told the officers that she was certain that the defendant was in the building and that she had no intention of leaving. Mrs. Ryan was eventually approached by an officer, later identified as Detective Jensen, who led her to a room down the hall. At that time, approximately 7:30 P.M., Mrs. Ryan was told that defendant had been arrested for the murder of John Pius. Mrs. Ryan requested to see the defendant but was refused. Mrs. Ryan, Mrs. Jepsky and the two boys then left the precinct and telephoned Mr. Ryan from a nearby phone booth. Mr. Ryan was informed of the charges against the defendant and was asked to contact an attorney. Mrs. Ryan, Mrs. Jepsky and the boys returned to the Ryans' residence. The defendant was eventually released by the police later that evening.

The defense also presented several character witnesses who testified as to defendant's reputation in the community.

Finally, the defense called Herman Race, a private investigator hired by the Ryans, to testify as to an interview he had with Ann Erickson on August 14, 1982. Race testified, after limiting instructions were given to the jury, that Erickson denied telling the Grand Jury that the defendant had "told her that he had anything to do with the Pius murder".

The defense also sought to introduce tape recordings of the conversation between Race and Erickson in a restaurant in Massachusetts. The tape recording also included subsequent phone conversations between Race and Erickson which related to several aspects of their restaurant conversation. The court conducted an audibility hearing of the tapes, out of the presence of the jury. At the outset, the defense counsel conceded that with respect to the tape of the restaurant conversation, there was background noise which was "very distracting". Race also testified after listening to the tape of the restaurant conversation, that "to the best of [his] ability," the

recording was accurate. However, Race conceded that due to the background noises, only 40 to 50% of Erickson's words were audible.

At the conclusion of the hearing, the court ruled that the tape recording of the restaurant conversation would not be admitted into evidence due to its inaudibility although the court did permit Race to testify as to the contents of that conversation with Erickson. The court also allowed the tape recordings of the two telephone conversations to be played for the jury. When defense counsel objected to the court's exclusion of the tape of the restaurant conversation on the basis that the lack of audibility went merely to the weight of the evidence and not its admissibility, the court stated:

"Your own witness concedes that you can only hear forty, fifty percent of the Ann Erickson statement.

"I have to say, based upon my listening, I couldn't discern anything near forty percent of what she had to say.

"For me to allow this jury to listen to a conversation of which the—your witness says you can only discern forty to fifty percent and which this Court feels you can discern a lot less than forty, fifty percent would be fundamentally unfair.

"I won't permit you to hear that side of the tape".

### C. Suppression Ruling

The suppression court conducted a lengthy hearing on the defendant's motion to suppress his statements made at the precinct on April 28, 1979, as well as those made to the police officers upon his arrest in October of 1981. The defendant testified at the suppression hearing and recounted the events leading up to his interrogation at the precinct. He claimed that he was subject to physical abuse during his questioning and at one point during the interrogation, was escorted to the boiler room of the precinct where he remained for approximately 45 minutes. The defendant further testified that he made several requests to leave the precinct or to make a phone call but that those requests were denied.

After a conclusion of the hearing, the court denied the defendant's motion to suppress his April 28, 1979 statements made to police as well as his remark made following his arrest in October 1981. With respect to the April 28, 1979 statements, the court credited the testimony of the People's witnesses and ruled that defendant was not in custody prior to 4:30 P.M. that day and thus no *Miranda* rights were required

before that time. The court noted further: "The subsequent arrest made at 4:30 that afternoon did not stem from any incriminating disclosures by Ryan but from a statement obtained from Quartararo which clearly implicated him and which provided probable cause for the arrest (People v Johnson, 75 AD2d 751, 427 NYS2d 120). Ryan was thereafter promptly given Miranda warnings and after waiving his rights, gave an oral and signed statement. The court finds these statements were made before any member of Ryan's family or any friend inquired of any police facility concerning defendant's whereabouts (cf., People v Evans, 70 AD2d 886, 417 NYS2d 9; People v Townsend, 33 NY2d 37, 347 NYS2d 187). Such statements are held herein to have been lawfully obtained from the defendant and voluntary in all other respects".

The suppression court also determined that the defendant's postarrest remark, "Was it Ann?", was admissible as a spontaneous declaration.

### D. Verdict

The jury returned a verdict finding the defendant guilty of two counts of murder in the second degree (Penal Law § 125.25 [1], [2]).

#### THE LAW

### A. Admissibility of Peter Quartararo's Confession

The defendant contends that his constitutional right of confrontation guaranteed by the 6th Amendment was violated by reason of the admission into evidence of Peter Quartararo's statement regarding the Pius murder. Although the defendant acknowledges that extrajudicial statements by unavailable declarants which possess sufficient indication of reliability may, in limited situations, be admitted into evidence without violating the accused's right of confrontation, he submits that under the facts of this case, Quartararo's confession was inadmissible. The defendant takes the position that Quartararo's confession was inherently unreliable by reason of the fact that it was given while in custody and in a coercive atmosphere. Moreover, the defendant asserts that the court-ordered redaction of the confession to eliminate any references to him and the court's limiting instructions to the jury were ineffectual in protecting his 6th Amendment right of confrontation.

■ ■ As in the prior appeal by the defendant's accomplice

Robert Brensic *(People v Brensic,* 119 AD2d 281, *supra),* the People herein maintain that Quartararo's confession was admitted under an exception to the hearsay rule for the sole purpose of rebutting the defense's attack on Detective Reck's credibility. As a result, the People submit that the defendant's 6th Amendment right of confrontation was not implicated by the introduction into evidence of the extrajudicial statement *(see, Tennessee v Street,* 471 US 409). We disagree.

The trial court's instructions to the jury regarding the evidentiary weight to be accorded to Peter Quartararo's confession were somewhat confusing. Although the trial court, prior to the introduction of Palumbo's testimony regarding Peter Quartararo's statement, unequivocally stated that the statement could only be used, if the jury so chose, to weigh the credibility of the People's witnesses, in its final jury charge the court indicated that the statement could be used as corroborative evidence of guilt. The trial court thus led the jury to believe that the confession could be utilized as evidence of guilt. On this point, it is also significant that during his summation to the jury, the prosecutor on several occasions placed great emphasis on the details of Quartararo's confession. In view of these circumstances, we conclude, as in *People v Brensic* (119 AD2d 281, *supra),* that the introduction of Quartararo's confession against the defendant implicated hearsay and right of confrontation principles.

■ Based on the facts of this case, we find that Peter Quartararo's statement constituted a declaration against penal interest and thus was admissible as an exception to the rule against the admissibility of hearsay testimony. As more fully outlined in *People v Brensic (supra),* declarations against penal interest are admissible as an exception to the rule against hearsay if: the declarant is unavailable to testify; he was aware that the statement was against his penal interest when made; the declarant had knowledge of the facts underlying the statement; and supporting circumstances are present to demonstrate the reliability and trustworthiness of the declaration *(see, People v Thomas,* 68 NY2d 194, 197; *People v Settles,* 46 NY2d 154, 167; *People v Maerling,* 46 NY2d 289). Peter Quartararo's statement readily satisfies these requirements. Quartararo was unavailable to testify by reason of the invocation of his 5th Amendment right against self-incrimination *(see, People v Settles, supra,* at p 167). Additionally, as an admitted participant in the killing, Quartararo obviously possessed competent knowledge of the facts, and the content of

the statement clearly suggests that Quartararo was aware that it was against his penal interest.

Finally, the supporting circumstances attest to the reliability of Peter Quartararo's statement. The testimony and statements of both O'Neil and Sparling regarding the events which they observed leading up to the defendant's confrontation with Pius on the evening of April 20, 1979, the evidence concerning the discovery of Pius' wallet, Sabina's observations upon his discovery of the body, and the medical evidence concerning Pius' cause of death, clearly substantiate the reliability and trustworthiness of Quartararo's confession. On this latter point, we reject the defendant's contention that Quartararo's confession was per se unreliable by reason of the fact that it was given while he was in a custodial atmosphere. Admittedly, the custodial status of an unavailable declarant warrants strict judicial scrutiny as to whether the statement was made voluntarily, without coercion, and without a motive on the declarant's part to curry favor with the interrogating officers *(see, People v Geoghegan,* 51 NY2d 45; *People v Trice,* 101 AD2d 581, 583). "However, the custodial status of the declarant is but one factor to consider in determining the trustworthiness and reliability of the statement" *(People v Brensic,* 119 AD2d 281, 301, *supra).* Herein, as we noted in *Brensic,* there is no evidence in the record to establish that Peter Quartararo's confession was the result of coercive or threatening tactics by the interrogating officers. This court in the prior appeal by Peter Quartararo from his murder conviction *(see, People v Quartararo,* 113 AD2d 845, *supra),* determined that the interrogation of Quartararo was not of such a nature as to require suppression of his statement. Moreover, there is no indication that Quartararo was seeking to curry favor with his interrogators.

The trial court herein also complied with the mandate of *People v Maerling* (46 NY2d 289, 298, *supra)* and *People v Geoghegan* (51 NY2d 45, *supra)* by deleting from Quartararo's statement all references to the defendant, Brensic and Michael Quartararo and thereby limiting the declaration to self-inculpation *(see also, People v Thomas,* 68 NY2d 194, *supra).* We do not agree with the defendant's contention that the redaction of the confession was meaningless. Given the extensive trial testimony which placed several youths, including the defendant in the vicinity of the schoolyard during the evening on April 20, 1979, we cannot agree that the jury necessarily substituted the defendant's name for one of the "other" partic-

ipants in the killing who were referred to in Quartararo's statement *(cf. People v Lopez,* 68 NY2d 683; *People v Wheeler,* 62 NY2d 867; *People v Smalls,* 55 NY2d 407; *People v Jackson,* 22 NY2d 446).

■ Nor do we find that the defendant's 6th Amendment right of confrontation was violated by the admission of Peter Quartararo's confession. It is well established that extrajudicial statements made by a nontestifying declarant are generally inadmissible against the accused since reception of such statements into evidence deprives the accused of an opportunity to confront the declarant and test his credibility *(see, Bruton v United States,* 391 US 123, 136). Thus, extrajudicial statements tending to implicate the accused are presumed to be unreliable and as a result, inadmissible *(see, Lee v Illinois,* 476 US—, 106 S Ct 2056; *California v Green,* 399 US 149; *Douglas v Alabama,* 380 US 415; *Dutton v Evans,* 400 US 74). This presumption of unreliability may be overcome, however, and the extrajudicial statement deemed admissible into evidence, if two requirements are satisfied. First, the declarant must be unavailable at the time of trial and second, the extrajudicial statement must possess sufficient " 'indicia of reliability' " as to its trustworthiness *(see, Ohio v Roberts,* 448 US 56, 66; *People v Geoghegan,* 51 NY2d 45, *supra; cf. Lee v Illinois,* 476 US—, 106 S Ct 2056, *supra).* As discussed previously, both of these criteria were satisfied herein. The evidence independent of Quartararo's confession provided the jury with a satisfactory basis for evaluating the credibility of the statement and the People have made a clear showing of particularized indicia of trustworthiness. Thus, although the defendant was unable to cross-examine Quartararo, the truth-finding function of the right of confrontation was fulfilled.

Finally, on this point, we emphasize that Quartararo's confession was admitted into evidence *after* defense counsel placed in evidence a police report which outlined the essence of the statement given by Quartararo which implicated defendant in the killing. We are in agreement with the trial court's comment that in view of the police report, the "door was opened" to Palumbo's testimony since the nonconfrontation problem was essentially rendered "academic". A(SHD)*B. Suppression Ruling*

Defendant contends that his constitutional rights were violated by the admission into evidence at trial of various statements attributed to him. Particularly, these statements include (1) the oral and written statements made by the defen-

dant on April 28, 1979, while at the police station, (2) the statements made by him on October 23, 1981, when he was arrested, and (3) oral statements made to Ann Erickson between May and July 1981. Each category of statement is treated separately below.

### Police Station Statements

The defendant maintains that his oral and written statements made at the police station prior to being given his *Miranda* rights should have been suppressed since they were the result of custodial interrogation by the police. He further submits that his post-*Miranda* written statement should also have been suppressed since it constituted fruit of the poisonous tree.

In *Miranda v Arizona* (384 US 436, 444), the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way". In determining whether the accused was in fact in custody prior to receiving his *Miranda* warnings, the subjective belief of the accused is not the determinative factor. "The test is not what the [accused] thought, but rather what a reasonable [person], innocent of any crime, would have thought had he been in the [accused's] position" *(People v Yukl,* 25 NY2d 585, 589, *rearg denied* 26 NY2d 883, *cert denied* 400 US 851; *Matter of Kwok T.,* 43 NY2d 213, 220). Moreover, in reviewing the suppression court's findings on the issue of whether the accused was in custody at the time of his interrogation, the suppression court's findings must be afforded great deference since it had the opportunity to see and hear the witnesses *(see, People v Yukl,* 25 NY2d 585, *supra; People v Prochilo,* 41 NY2d 759, 761). Thus, in the event that the evidence permits the drawing of conflicting inferences, the determination is for the hearing court and it should be upheld unless unsupported by the evidence *(see, People v Oates,* 104 AD2d 907, 910).

■ We are in agreement with the suppression court's determination that the defendant's station house statements should not be suppressed. The facts as adduced at the suppression hearing established that prior to 4:30 P.M. on the afternoon of April 28, 1979, the defendant was not considered a suspect by the police in the Pius killing but rather was considered to be a possible witness. In fact the investigating police officers testi-

fied that until they learned of Peter Quartararo's confession implicating the defendant in the killing, they thought that the defendant was covering up for the then murder suspects, Sparling, O'Neil and St. Dennis. The defendant was brought to the police station on a voluntary basis for the sole purpose of assisting the police in their investigation of the Pius killing. When the defendant arrived at the station, he was immediately advised by Detective Reck that he was free to leave at any time. During the questioning, the defendant was never physically restrained and was permitted to go to the bathroom unattended. At no time did he request that the officers cease their questioning. Based on these factors, we agree that the defendant was not in custody until 4:30 P.M. on the afternoon in question when the police learned of Quartararo's statement. At that point in time the defendant was obviously no longer free to leave and was entitled to, and did receive, *Miranda* warnings.

We note that the defendant places great emphasis on the fact that during the initial questioning by police, he made statements regarding his possible complicity in the theft of the motorbike but was not given his *Miranda* warnings until several hours later. Accordingly, the defendant contends that his rights were violated by the continued interrogation. We disagree. The fact that a defendant makes incriminating statements during police questioning does not in and of itself render the interrogation custodial, thereby requiring the police to administer *Miranda* warnings. The critical factor to be considered is whether the accused's freedom of movement was restricted or impaired by the interrogating officers after the incriminating statements were made. Thus, in *United States v Burke* (700 F2d 70) the Second Circuit rejected the defendant's contention that his confession, made during police questioning, should have been suppressed because he was never advised of his *Miranda* rights. The *Burke* court stated:

"*Miranda* warnings need not be delivered in a noncustodial interrogation even if the government's criminal investigation has reached a stage where the defendant is the focus of the inquiry. *See Beckwith v. United States,* 425 U.S. at 345, 96 S. Ct. at 1615.

"In this action, Judge Bramwell properly ruled that Kuhn's admissions were not the product of a custodial interrogation. The FBI agents advised Kuhn, at two separate points during their conversation, that he was not legally obligated to speak with them. In fact, even after he admitted complicity in the

point shaving scheme, the agents left the Kuhn property without arresting or otherwise restricting his freedom. The defendant has failed to convince us on appeal that his freedom of movement was impaired or restricted by Agents Byron and Sweeney. *See Oregon v. Mathiason,* 429 U.S. at 495, 97 S. Ct. at 713 (after bringing the defendant into an interrogation room at the police station, officer [falsely] stated that defendant's fingerprints were found at the scene of the crime: held, no Miranda problems because the defendant was not arrested, nor was his freedom of movement restricted in any way when he voluntarily confessed to the crime)" *(United States v Burke, supra,* at p 84).

Similarly, in the *Matter of Kwok T.* (43 NY2d 213, *supra)* the Court of Appeals stated that a suspect's awareness that the police already possess incriminating evidence against him at the time the police interrogation is conducted is generally irrelevant in determining whether the interrogation was custodial. Therein, since the manner of the police questioning could not be characterized as custodial, the court held that the police were not required to give the accused preinterrogation *Miranda* warnings *(Matter of Kwok T., supra,* at p 220; *see also, People v Johnson,* 91 AD2d 327, *affd* 61 NY2d 932).

In the case at bar, Detective Reck testified that the defendant's statement regarding the motorbike theft by Brensic did not change the defendant's status from that of a potential witness to that of a suspect. In fact, Reck stated that he was not interested in the motorbike theft since it was collateral to the murder investigation. Moreover, on this point it is significant to note that the defendant's remarks concerning the motorbike theft were not direct admissions of guilt in the theft since he stated that "Brensic had stolen the mini-bike". In any event, his freedom of movement was not impaired or restricted during the police interrogation until 4:30 P.M., at which time he was advised of his rights. Thus, since the manner of the police inquiry could not be characterized as custodial prior to 4:30 P.M. that afternoon, the defendant's statements made prior to that time, without the benefit of *Miranda* warnings, need not have been suppressed.

Moreover, the defendant's reliance on the cases of *People v Biggs* (88 AD2d 960) and *People v Grant* (80 AD2d 862), to support his position is misplaced. In *Biggs,* the defendant was already considered a suspect in the murder investigation at the time that the armed police officers went to his apartment, sometime after midnight, to request him to accompany them

to the precinct for questioning. This court reversed the hearing court and granted the defendant's suppression motion stating, *inter alia:* " 'There having been no probable cause for placing defendant in custody, the confession was, thus, illegally obtained.' The conduct of the police in view of the weather conditions, the distance involved, the underlying threat of the drug charge, the age and intelligence of the defendant, who had no previous involvement with the law, all support the finding that defendant was in fact 'in custody' from the moment he was placed in the police car in Yonkers. Since it is unquestioned that there was no probable cause to arrest the defendant, the fact that he was 'in custody' taints any confession he may have made as being the fruit of an illegal detention (see *Wong Sun v United States,* 371 US 471; *People v Grant, supra). Furthermore, since the confession was obtained during the course of an illegal detention by detectives, whose sole purpose was to obtain a confession, there was no attenuation and the confession must be suppressed" (People v Biggs, supra,* at p 962; emphasis added).

The primary distinction between *Biggs (supra)* and the case at bar centers upon the fact that the defendant in *Biggs* was already considered a suspect in the murder at the time that the police approached him for questioning. Herein, the defendant was not considered a suspect in the Pius killing until approximately 2½ hours into the questioning at which time he was immediately and fully advised of his *Miranda* rights. It is also significant that during the 12- to 14-hour interrogation in *Biggs,* which encompassed the early morning hours, the defendant was never advised that he was free to leave.

In *People v Grant* (80 AD2d 862, *supra),* the defendant had been questioned by the police on three separate occasions in regard to a murder investigation. Immediately prior to his third encounter with the police, the investigating detectives gained new information and decided to speak to the defendant again. One detective testified that "their purpose [in speaking with the defendant] was to elicit a confession from [him], for he could not otherwise have been arrested" *(People v Grant, supra,* at p 863). The detectives located the defendant in Hempstead driving his car. The officers signaled to the defendant to pull over and when his car came to a halt, the detectives asked the defendant to accompany them to the precinct for further questioning. The defendant was not advised that he did not have to accompany the officers. At the officers' directive, the defendant rode to the station in the

officers' vehicle while his own was driven by one of the detectives. The questioning at the precinct commenced at approximately 9:00 P.M. and continued until 3:30 A.M., when the defendant finally confessed to the crime. Throughout the questioning, the defendant was never informed that he was free to leave. At one point during the questioning, the defendant went to the bathroom. He was escorted there and back and, while inside, a detective remained outside the door.

Based on the aforesaid facts, this court in *Grant (supra)* reversed the judgment of conviction on the basis that the defendant's confession should have been suppressed. Specifically, the *Grant* court concluded that the defendant was clearly "in custody" during the questioning and "[t]here having been no probable cause for placing defendant in custody, the confession was, thus, illegally obtained" *(People v Grant, supra,* at p 863). As the hearing court in the case at bar noted, however, the *Grant* case is factually distinguishable on the basis that "the motive for stopping Ryan was to question him as a witness and not as a suspect. Secondly, although Ryan may have subjectively believed his freedom of movement was significantly restricted at the time of the stop, he was advised by Reck shortly thereafter and before commencement of questioning that he was free to go and he agreed to remain".

Clearly, herein defendant's statements made prior to 4:30 P.M. on the afternoon in question were properly not suppressed since he was not in custody at that time. Additionally, once he was identified as a murder suspect by the police as a result of Quartararo's confession, he was immediately and fully advised of his *Miranda* rights which he voluntarily waived. Accordingly, his oral and written statements made thereafter at the police station were lawfully obtained.

### The October 23, 1981 Statement

Upon his arrest on October 23, 1981, the defendant made the following statement, "I knew it was only a matter of time". After receiving his *Miranda* warnings, the defendant stated that he wished to ask a question. When the officer inquired as to what the defendant wanted, the defendant replied, "Was it Ann?" The officer asked, "Ann who?" to which defendant responded, "What did Ann tell you?". The suppression court characterized the first two statements made by the defendant as spontaneous declarations and thus admissible. The remaining statement, however, was suppressed

since it was made in response to the officer's inquiry. At trial, the prosecution only offered the remark, "Was it Ann?" into evidence. The defendant contends on appeal that this single statement was not spontaneous and should have been suppressed since it was taken in violation of his right to counsel.

■ The People concede that the defendant's right to counsel had indelibly attached prior to his arrest on October 23, 1981. However, they submit that the suppression court properly determined that defendant's utterance, "Was it Ann?", was spontaneous and thus admissible. We agree.

It is well established that volunteered statements made by a defendant in the absence of counsel are admissible provided "the spontaneity [is] genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed" (People v Maerling, 46 NY2d 289, 302-303, supra; People v Kaye, 25 NY2d 139). The issue of spontaneity turns on whether the statement was "triggered by police conduct which should reasonably have been anticipated to evoke a declaration from the defendant" (People v Lynes, 49 NY2d 286, 295; People v Bryant, 59 NY2d 786, 788; People v Huffman, 61 NY2d 795, 797). Not every remark by a police officer which is followed by a defendant's incriminating statement, however, constitutes interrogation even where the comment is made directly to the defendant (People v Lynes, supra; People v Bryant, supra).

Applying the aforesaid standards to the instant case, it is clear that the defendant's statement, "Was it Ann?" was spontaneous and not "the product of 'express questioning or its functional equivalent' " (People v Bryant, supra, at p 788, quoting Rhode Is. v Innis, 446 US 291, 300-301). The defendant initiated the rather brief conversation with Detective Miller when he asked it he could ask a question. The officer's simple response, "What is it?", as the hearing court herein determined, cannot be reasonably interpreted as a comment which was likely to elicit an incriminating statement (see, People v Lynes, 49 NY2d 286, supra).

### Ann Erickson's Testimony

As noted previously, Ann Erickson, who had been dating the defendant during 1981, testified that in the months of May through July of that year, the defendant made the following statements: (1) that he feared for Peter Quartararo and anticipated that he would be next, (2) that he feared going to jail,

and (3) that "you can't love someone who took someone else's life". The defendant argues that this testimony should not have been admitted into evidence since the aforementioned remarks did not unequivocally refer to the Pius murder and were made, not as a result of the defendant's guilty conscience, but by the fear and despair of an adolescent.

■ Initially, we note that the defendant did not object to the admission of this testimony at trial and, as such, has failed to preserve this claim for appellate review (see, CPL 470.05 [2]; *People v Whalen,* 59 NY2d 273). In any event, his claim of error is without merit.

Generally, incriminating statements made by a defendant, in order to be admissible, must be unambiguous in content and unequivocally relate to the subject crime. Furthermore, the circumstances in which the remarks were made must not detract from their reliability (see, *People v Smith,* 104 AD2d 160, 164; *People v Knatz,* 76 AD2d 889). Contrary to the defendant's assertions, the statements he made to Erickson given the context in which they were made, were not ambiguous and clearly related to the Pius murder. Of particular significance is the fact that the statements were uttered during conversations concerning the Pius killing. Additionally, the circumstances in which these statements were made indicate that the defendant spoke voluntarily, knowingly and not out of despair or fear. To this extent, the case at bar differs markedly from *People v Knatz (supra),* relied upon by the defendant, since therein the alleged incriminating statements were made in the defendant's sleep and were not recalled by him. Finally, it is necessary to emphasize that the defendant's urgings to Erickson that she not say anything about his remarks, coupled with his statement, "Was it Ann?" to Detective Miller upon his arrest, demonstrate the reliability of his prior incriminating statements.

## C. Excluded Tape Recordings

■ The defendant claims that the trial court erred in excluding from evidence the tape recording of Race's restaurant conversation with Erickson in 1981 on the basis of the inaudibility of the tape. The defendant maintains that the matter of audibility goes only to the weight and not the admissibility of the recording. We disagree.

"The law is clear that a recording must be excluded from evidence if it is so inaudible and indistinct that a jury must speculate as to its contents" (*People v Mincey,* 64 AD2d 615,

*mot to dismiss appeal denied* 46 NY2d 937). Thus, "a tape should at least be sufficiently audible so that independent third parties can listen to it and produce a reasonable transcript" *(People v Mincey, supra,* p 615; *People v Lubow,* 29 NY2d 58, 68). The question of whether a tape recording should be admitted into evidence is within the discretion of the trial court after weighing the probative value of the evidence against the potential for prejudice *(see, People v Brown,* 104 AD2d 1044).

In the case at bar, the trial court determined, based on its review of the taped conversation, that a large portion of the tape was substantially inaudible due to numerous background noises emanating from the restaurant where the conversation took place. In fact, Race conceded that only 40 to 50% of Erickson's remarks were audible. In this respect, this case is almost identical to *People v Bernstein* (69 AD2d 907) in which this court found reversible error in the admission into evidence of a tape made by an undercover officer. The *Bernstein* court noted, "[t]he tape consisted mainly of background noises of a busy restaurant from which only isolated phrases of conversation could be discerned" *(People v Bernstein, supra,* at p 907). The same audibility problem exists in the case at bar and accordingly the tape was properly excluded from evidence.

We note that the defendant's reliance upon the case of *People v McGee* (49 NY2d 48, *cert denied sub nom. Waters v New York,* 446 US 942) for the proposition that the audibility of a tape only affects the weight of the evidence and not its admissibility, is misplaced. In *McGee,* the Court of Appeals determined that the necessary foundation for the introduction of a tape recording "may be established by a participant to the conversation who testifies that the conversation has been accurately and fairly reproduced * * * This testimony, if credited by the Trial Judge, is sufficient to establish that the taped conversation accurately and fairly represents the event to which it refers" *(People v McGee, supra,* at p 60). Applying those standards to the facts of that case, the *McGee* court stated further "[o]n this record, there is sufficient proof of accuracy and authenticity of the tapes offered to warrant their admission. The infirmities concerning chain of custody or inaudibility properly go to the weight of the evidence, not its admissibility" *(People v McGee, supra,* at p 60). Relying on the aforesaid language, the defendant incorrectly argues that once a participant to a taped conversation claims the recording is

accurate and authentic, the tape is admissible. It is essential to emphasize, however, that the holding in *McGee* did not remove the trial court's discretion to determine in the first instance, the audibility, accuracy and authenticity of the tape recording.

Moreover, even if we were to assume that the subject tape recording was improperly excluded, the defendant was not prejudiced by the trial court's ruling. Race was permitted to testify at length concerning his restaurant conversation with Erickson and the jury listened to the two recorded telephone conversations which allegedly confirmed Erickson's restaurant statements.

## D. Proof Beyond a Reasonable Doubt

■ The defendant next argues that there was insufficient evidence in the record to support the jury's verdict of guilt. Based upon our review of the record and viewing the evidence, as we must, in the light most favorable to the prosecution *(see, Jackson v Virginia,* 443 US 307, 319, *reh denied* 444 US 890; *People v Lewis,* 64 NY2d 1111, 1112; *People v Bauer,* 113 AD2d 543, 548), we conclude that the verdict of guilt is amply supported by the evidence.

## E. Alleged Inconsistent Verdicts

■ The defendant further maintains that the verdict finding him guilty of intentional murder (Penal Law § 125.25 [1]) and depraved indifference murder (Penal Law § 125.25 [2]) is legally inconsistent and should be set aside. He posits that the two murder counts should have been submitted to the jury in the alternative.

Initially we note that the defendant failed to preserve his claim of error by not registering an objection to the alleged inconsistency of the verdicts prior to the discharge of the jury *(see, People v Alfaro,* 66 NY2d 985, 987). In any event, his argument is without merit for the same reasons set forth in *People v Brensic* (119 AD2d 281, *supra).*

### CONCLUSION

In view of the above analysis, the defendant's judgment of conviction should be affirmed. Peter Quartararo's confession was properly admitted against the defendant under the declaration against penal interest exception to the rule against hearsay and the defendant's constitutional right of confrontation was not violated as a result thereof. Additionally, the

defendant's station house admissions as well as his statements made to his girlfriend and those uttered at the time of his arrest, were properly deemed admissible by the hearing court. The aforesaid evidence, taken together with the other evidence of guilt adduced at trial, amply supports the jury's verdict.

We have reviewed the defendant's remaining contentions and find them to be without merit.

MANGANO, LAWRENCE and KOOPER, JJ., concur.

Ordered that the judgment of the County Court, Suffolk County, rendered June 27, 1983, is affirmed.