■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v BRIAN BIGGS, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Suffolk County (Corso, J.), rendered November 30, 1979, convicting him of manslaughter in the first degree, upon a plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of defendant's motion to suppress certain statements. Judgment reversed, on the law, plea vacated, motion granted, defendant's statements made on January 9, 1979 are suppressed and case remitted to Criminal Term for further proceedings. In late December, 1978, the body of a murder victim, one Watson, who had been shot to death, was found in Suffolk County. It developed that the deceased had lived in an apartment house in Yonkers, in Westchester County. The Suffolk County police conducted an investigation that soon centered on the defendant and two other men who lived together in the same apartment building as the deceased. Sometime after midnight on the morning of January 9, 1979, eight Suffolk County detectives went to the suspects' apartment in Yonkers and transported them some 58 miles, on what was conceded to be a windy, snowy, bitterly cold night, to the Suffolk County police headquarters in Hauppauge, where, some 12 to 14 hours later, the defendant and the two other men confessed to the murder. The sole question presented is whether defendant was "in custody" at the time he confessed to the crime. According to the People's witnesses at the suppression hearing, the detectives involved in the murder investigation had a meeting on the evening of January 8, 1979 at Hauppauge, to consider their progress. They were in general agreement that they had nothing but suspicions about the three suspects and certainly had no probable cause to arrest or detain them. It was then decided that they would go to Yonkers to attempt to get the three suspects to return to Suffolk County and talk to them. Eight detectives drove in three cars to Yonkers and arrived at their apartment shortly after 1:00 A.M. on the morning of January 9, 1979. As they arrived at the premises they noticed one of the suspects driving away in his car. Two of the detectives followed his car, pulled it over and got the suspect to agree to return to the apartment. Back at the apartment building three of the detectives went to the suspects' apartment and knocked on the door. Two other detectives remained in the parking lot of the building, one detective stationed himself on the main floor, another on the first floor staircase and the last

officer stationed himself on the second floor staircase. All of the officers were armed. When the apartment door was opened the three officers entered and had a conversation with one of the other men, one Chang, as well as with the defendant. The officers stated that they wanted to talk to the men about the murder of Watson. Chang stated that they could talk right there in the apartment; but because several other people were present and loud music was playing, the officers stated that they could not talk in the apartment. At this point the officers also told the suspects that they were well aware that they were, and had been, dealing in marihuana. This statement provoked the response from the suspects that they did not want to have anything to do with the Yonkers police and that they were afraid of the narcotics people. The officers also testified that at this time they were hearing derogatory remarks from the other people in the apartment. They asked the suspects if they would be willing to go with them to Suffolk County, and after a short conference among themselves, but in the presence of the officers, they agreed to go with them. As they were leaving, one of the officers went into a vacant apartment across the hall from the one occupied by the suspects and took from the refrigerator a quantity of marihuana, which allegedly belonged to the suspects. When they left the apartment house each suspect was placed separately in the back seat of one of the police cars. The defendant was placed in the back seat of one of the cars with a detective sergeant. The driver and one other officer occupied the front seat. After they got into the car, but before they started up, the sergeant gave the defendant his *Miranda* warnings. Subsequently these warnings were repeated after arrival in Suffolk County. The caravan arrived in Hauppauge shortly after 3:00 A.M. on the morning of January 9, 1979. The three suspects were taken to separate rooms and questioned continuously until around 5:30 A.M., at which time the defendant made an admission about having had a gun. Using that admission on Chang they obtained further statements from him as to where the gun was hidden. Questioning stopped at about 6:30 A.M. The police obtained a search warrant and officers went back to the apartment in Yonkers and located the gun at about 1:00 P.M. They returned with the gun to Hauppauge at about 3:30 P.M. The suspects were again questioned, with each one's admissions being used against the others. Finally, at some time between 5:30 and 6:00 P.M., all three agreed to give written confessions, and they did so. They were placed under formal arrest at about 7:30 P.M. During this entire period the suspects were without sleep except for some periods when they were allowed to doze in their chairs. The officers testified that the suspects had nothing to eat during this period since, although food was offered to them, they refused it. The suspects' version of what occurred as testified to by them and their witnesses was quite different. They claimed that the officers burst into the apartment with guns drawn, handcuffed them and took them to the police cars. As they were being driven to Suffolk County they were threatened and upon arrival at Hauppauge they were abused, threatened, beaten with a cane and a metal rod and otherwise tortured, until they confessed. In the opinion of the hearing court: "The testimony of the defendants and many of their witnesses was at best only superficially coherent and generally vague, inconsistent, riddled with contradictions, and very often incredible as the record clearly shows." We are in agreement with this assessment by the court. While thus deferring to the discretion of the hearing court in its assessment of credibility, we disagree with its conclusion that defendant was not "in custody" and was free to go at any time up until he confessed to having had a gun in his possession. The officers freely testified that they went to Yonkers early in the morning of January 9, 1979, with the intention of getting the suspects *to return to*

*Hauppauge* and talk to them. It is clear that they never had any intention of interrogating these men at their apartment or at any other location in Yonkers. They regarded it as being vital that they bring them to Suffolk County to their headquarters. Every action they took was intended to place the suspects in a solitary, custodial setting and atmosphere designed to extract damaging admissions from them. It started with their arrival at the apartment in Yonkers, with five detectives deployed at strategic locations in the building while three others entered the apartment. Almost immediately upon entry one of the officers told the suspects that they could not talk there and "invited" them to accompany the officers to the cozy confines of their headquarters some 58 miles away. This was followed immediately by what can best be characterized as an implied threat that if the suspects did not accept their invitation to go to Suffolk County they would be brought to the Yonkers police on drug charges. Apparently to make sure that the defendant and the others understood this, one of the officers retrieved their supply of marihuana and brought it with them. When the suspects were taken from the apartment building they were immediately separated and each one was placed in a separate police car with two or three officers. From that time on, even though they may have been given ritualistic *Miranda* warnings, neither defendant nor any of the others was ever told that they were free to go. At police headquarters they were kept completely separated from each other and were never out of sight of one or more police officers, and, of course, were constantly interrrogated for several hours throughout the night. Similar conduct involving like activity on the part of police officers had been previously considered by this court in *People v Grant* (80 AD2d 862, app dsmd 56 NY2d 611). What was said in the *Grant* case is also applicable to the within matter (p 863): "In view of the circumstances surrounding defendant's encounter with the police, one would be hard-pressed to say that a reasonable person, innocent of any crime, would not have thought he was in custody had he been in defendant's position (see *Matter of Kwok T.*, 43 NY2d 213; *People v Yukl,* 25 NY2d 585, cert den 400 US 851). There having been no probable cause for placing defendant in custody, the confession was, thus, illegally obtained." The conduct of the police in view of the weather conditions, the distance involved, the underlying threat of the drug charge, the age and intelligence of the defendant, who had no previous involvement with the law, all support the finding that defendant was in fact "in custody" from the moment he was placed in the police car in Yonkers. Since it is unquestioned that there was no probable cause to arrest the defendant, the fact that he was "in custody" taints any confession he may have made as being the fruit of an illegal detention (see *Wong Sun v United States,* 371 US 471; *People v Grant, supra*). Furthermore, since the confession was obtained during the course of an illegal detention by detectives, whose sole purpose was to obtain a confession, there was no attenuation and the confession must be suppressed. Bracken, J. P., Brown, Niehoff and Rubin, JJ., concur.