■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARC PAYNE, Appellant. [838 NYS2d 123]—

Appeal by the defendant from a judgment of the Supreme Court, Kings County (Leventhal, J.), rendered April 20, 2004, convicting him of manslaughter in the second degree and aggravated criminal contempt, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress his statements to law enforcement officials.

Ordered that the judgment is affirmed.

The defendant allegedly strangled his companion (hereinafter the victim) on June 27, 2001. On July 1, 2001 New Jersey law enforcement officers discovered, in a suitcase in a state park, the decomposed body of a woman, which was later identified as that of the victim. In July of 2001 the defendant filed a missing person's report claiming to have last seen the victim on June 27, 2001.

During their investigation, the police discovered that on June 30, 2001 the defendant had borrowed his stepmother's 1995 Nissan Pathfinder (hereinafter the SUV) allegedly to move out of the apartment that he shared with the victim. When the defendant returned the SUV on July 1, 2001 it had been visibly cleaned, but it had a strong odor emanating from the rear cargo area. Detectives impounded the SUV and arranged for a "cadaver dog" to be brought to the SUV.

At approximately 2:30 P.M. on July 19, 2001, the police, at the

defendant's request, went to his apartment. After the police informed the defendant that the body of the victim had been discovered, they advised him that he "needed" to accompany them to the precinct to discuss "the situation." The defendant agreed and then spent approximately seven hours at the precinct.

After approximately three hours of questioning, the detectives received information that the cadaver dog had a positive reaction to the rear of the SUV, indicating that human remains had recently been in that area of the vehicle. Once detectives received this information, they asked the defendant whether the victim had ever been inside the SUV. The defendant responded that the victim had only been a passenger in the front of the vehicle, but denied that she had ever been in the back of the vehicle. The detectives then asked the defendant why New Jersey officials found the victim's bodily fluids in the SUV. The defendant merely stared in response and then asked detectives what would happen to his son. Detectives responded that his son would be well taken care of, but that they "need to understand what's happening here." The defendant then asked to speak to one of the detectives alone. Once alone with this detective, the defendant admitted to arguing with the victim and strangling her. It was at this point that the detective stopped the interview and within minutes *Miranda* warnings (*see Miranda v Arizona,* 384 US 436 [1966]) were administered to the defendant. Following a waiver of those rights, the defendant gave a detailed statement confessing to the killing. Subsequently, the defendant gave a videotaped statement to an Assistant District Attorney which was consistent with his prior statements.

The defendant correctly contends that the pre-*Miranda* and post-*Miranda* statements to law enforcement officials should have been suppressed. "The standard for analyzing whether a statement made prior to the administration of *Miranda* warnings was the product of custodial interrogation is whether a reasonable person, innocent of any crime, would have thought that he or she was free to leave the presence of the police" (*People v Morales,* 25 AD3d 624, 625 [2006] [citations omitted]; *see People v Yukl,* 25 NY2d 585 [1969]; *People v Centano,* 76 NY2d 837 [1990]). Applying this standard and considering all of the relevant factors, an innocent person in the defendant's position would not have believed that he was free to leave when confronted with the information regarding the cadaver dog (*see People v Vachet,* 5 AD3d 700, 702 [2004]; *People v Macklin,* 202 AD2d 445 [1994]). Accordingly, the Supreme Court should have

suppressed the inculpatory statements that the defendant made to law enforcement officials before he was administered *Miranda* warnings (*see People v Vachet, supra; People v Macklin, supra*). Moreover, since there was no definite, pronounced break between the defendant's initial, inculpatory statement and the statements he made immediately after he was advised of his *Miranda* rights, all of those subsequent statements should have been suppressed as well (*see People v Bethea*, 67 NY2d 364 [1986]; *People v Chapple*, 38 NY2d 112 [1975]; *People Morales*, 25 AD3d 624 [2006], *supra*). The defendant's videotaped statement was also inadmissible, as it was not sufficiently attenuated to remove the taint from the earlier questioning (*cf. People v Morales, supra; People v Vachet, supra*).

However, reversal is not required inasmuch as at trial, the People presented overwhelming proof of the defendant's guilt, including, inter alia, incriminating statements made by the defendant to a friend, expert medical testimony concerning the victim's time and manner of death, and testimony regarding the defendant's motive. Therefore, in light of this overwhelming evidence, the erroneous admission of the defendant's incriminating statements at the police precinct was harmless error (*see People v Crimmins*, 36 NY2d 230 [1975]; *People v Paulman*, 5 NY3d 122 [2005]; *People v Celleri*, 29 AD3d 707 [2006]; *People v Morales*, 25 AD3d 624 [2006], *supra*; *People v Vachet*, 5 AD3d 700 [2004], *supra*; *People v Zappulla*, 282 AD2d 696, 698 [2001]).

The defendant's remaining contention need not be reached in light of our determination. Spolzino, J.P., Skelos, Dillon and McCarthy, JJ., concur.