# United States Court of Appeals

## For the First Circuit

No. 09-2405

UNITED STATES OF AMERICA,

Appellee,

v.

BRIAN K. ROGERS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter, Associate Justice,*
and Stahl, Circuit Judge.

Robert C. Andrews was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Thomas E.
Delahanty II, United States Attorney, was on brief, for appellee.

October 4, 2011

---

* The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, <u>Associate Justice</u>.  Brian Rogers sold a personal computer, in which the buyer found what he correctly thought was child pornography.  He gave the material to the local police in Brunswick, Maine, who enlisted the help of the state's computer crime unit, and because Rogers was a non-commissioned Naval officer at the Brunswick Naval Air Station, the Naval Criminal Investigative Service (NCIS) was also notified.  After a search of his house and interrogation there and at the Brunswick police station by local, state, and federal investigators, he was charged with unlawful possession of child pornography under 18 U.S.C. §§ 2252A(a)(5)(B), 2256(8)(A).  He pleaded guilty, though reserving the right to appeal the district court's denial of his motion to suppress his statements as having been taken in violation of <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966).  We now hold that the questioning at the house without warning of rights violated <u>Miranda</u> and remand for further consideration of the sufficiency of any curative action in support of the subsequent Miranda warnings, as required by <u>Missouri</u> v. <u>Seibert</u>, 542 U.S. 600 (2004).  Given this disposition, it would be premature, and may ultimately be unnecessary, to examine the reasonableness of the five-year prison sentence, which Rogers was also free to challenge.

The Maine authorities obtained a warrant to search the small condominium (including a computer located there) that Rogers occupied with his pregnant wife and small child, and they made plans to conduct the search on a morning when Rogers would be on duty at the Air Station. Two members of the NCIS (one of whom was Heather Ryan) requested Rogers's commanding officer to order him to report to them in the parking lot, where they instructed him that he needed to go home, but gave no further explanation beyond assuring him that his wife was all right.

When he arrived, an unmarked police cruiser with two officers was outside, along with an unmarked van used by Maine's computer crime unit. Inside his house were a local officer in plain clothes and two state officers in battle dress with visible side arms. One of them explained the circumstances to Rogers when he entered the house, and the local officer then joined them in the living room, leaving one state officer with Rogers's wife in the kitchen. The state officer told Rogers that he was not about to be arrested and suggested reassuringly that the police were concerned not with the mere presence of child pornography on the computer but with its production. In response to questions, Rogers first denied he had downloaded the material, but eventually admitted to it. Because of other activity in the room, the Brunswick officer

-3-

suggested they go elsewhere, and Rogers chose the driveway, where he agreed to speak further. When he asked if Rogers had anything further to tell him on the subject, the officer added, "[t]oday's the day mister, today is the day." In the meantime Ryan arrived, though she asked no questions.

Having interviewed him for about fifty minutes in and outside of his house, the local officer asked if Rogers would come to the police station for more formal questioning, and he agreed. He and his wife drove to the station house, where the officer and Ryan questioned him, after reassurances that he would not be arrested that day and that "we're not forcing you to be right here . . . . that door's unlocked [and] [n]obody's going to jump out and try to stop ya . . . ." These representations were spliced into Ryan's explanation that Rogers was free to go, that she was a civilian NCIS officer who did not work for Rogers's command, and that as an NCIS officer she was required to read from a "Military Suspect's Acknowledgment and Waiver of Rights" form. She proceeded to advise Rogers of his right to remain silent, that incriminating use could be made of any statement, of his right to paid civilian or free military counsel who could be present at the interview, and of the right to stop the interview. Rogers said he just wanted to "get this over with," agreed to talk, and signed a waiver of

-4-

rights.  After a change of location, he answered questions, adding further detail to the answers he had already given at his house, and about an hour after arriving at the station he left with his wife.  Throughout the two periods of questioning no voices were raised, and at no time did Rogers show any sign of distress.

Rogers's motion to suppress his self-incriminating statements presents three principal issues, the first being whether he was in police custody subject to coercive pressure to speak, during his exchange with the police at his house, so that his statements there should be suppressed as taken without the warning required by Miranda.  See United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010).  The second is whether he was likewise in custody when he gave similar statements at the police station; and third, whether the military version of Miranda warnings he was given were ineffective to distinguish the later questioning from the unwarned interrogation at the house, in which case the later statements, too, should be suppressed.  The district court concluded that Rogers was not in custody at the house or at the station, Miranda therefore being inapplicable.

Our review of the mixed questions of fact and law is de novo, subject to clear error review of purely fact issues.  See United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir.

1998).  We also "may accord some deference" to the district court's application of law to particular facts.  United States v. Jackson, 608 F.3d 100, 102 (1st Cir. 2010).

To begin with, we think Rogers was in custody at the house under conditions that required the Miranda warnings, the want of which compels suppression of the statements given there.  Our understanding of those conditions, like the district court's, rests on the careful report of a magistrate's findings, set out in far greater detail than the summary we have just given, and the dispositive basis for our disagreement with the district court goes to the weight to be assigned to the influence of military authority on someone in Rogers's position when subject to the order he was given on the morning he was questioned.

Our assessment of the significance of that order is premised on the psychological insight that prompted adoption of the Miranda requirement to warn of the rights to silence and counsel, and the risks of speaking.  The point of Miranda was to preserve the suspect's Fifth Amendment privilege against compelled self-incrimination, be it by confession or admission, during "custodial interrogation," whether the questioning occurs in traditionally formal custody or while a suspect is "otherwise deprived of his freedom of action in any significant way."  Miranda, 384 U.S. at

444.  Significant deprivation occurs in circumstances carrying a "badge of intimidation," id. at 457, or "inherent compulsions," id. at 467, or as the Supreme Court later put it, in circumstances that "blur[] the line between voluntary and involuntary statements, and thus heighten[] the risk" that the Fifth Amendment privilege will not be appreciated, Dickerson v. United States, 530 U.S. 428, 435 (2000).  Over the years the effort to test for custodial conditions that make it hard to tell where willingness to speak would end and unwilling submission to questioning would begin has boiled the enquiry down to two elements: whether a reasonable person in the circumstances would have felt "at liberty to terminate the interrogation and leave," Thompson v. Keohane, 516 U.S. 99, 112 (1995), and if not, whether those circumstances would have been likely to coerce a suspect to engage in back and forth with the police, as in the paradigm example of traditional questioning, Berkemer v. McCarty, 468 U.S. 420, 436-37 (1984).

When events unfold as they did here, the crux of the first element must be liberty to terminate the verbal engagement with the police, not the liberty to leave; Rogers, after all, arrived home to find three police officers in control of his house under the authority of a warrant, questioning his pregnant wife. The test must thus be adjusted to look for a sense of freedom to

limit conversation that would have been felt by someone with liberty to depart, and while a suspect questioned on his premises during a search does not necessarily lack that freedom, Rogers would naturally have felt close to the limit of voluntary action. He received no indication that he could avoid the officers then in control of his dwelling, and although he was told that he would not be arrested and taken away, he was not advised that he was free to have nothing to do with the enquiring police officers while they were there. Indeed, as against the vague question, "Still cool talking with me?", he was told that the time had come to say whatever he might have to say on the subject of his possession of the pornography: "Today's the day mister, today is the day."

But the most significant element in analyzing the situation is that the military had made certain that Rogers did not walk into it voluntarily, or confront the police with free choice to be where he was. The government was realistic when it wrote in its brief that "Rogers's commander at the . . . Naval Air Station . . . ordered Rogers to return to his home." Not only was he under a military order to be there at the time, but a reasonable person could not have doubted that the commanding officer had been aware of what was ahead and was purposely ordering his subordinate into the company of the police and, shortly, the Naval investigator who

gave him his particular instructions at the Air Station.  Nor was anything said or done at the house to relieve the force of the order; the state and local police lacked the authority and NCIS officer Ryan said nothing to Rogers while there.  See People v. Kelley, 424 P.2d 947, 958-59 (Cal. 1967) (defendant subject to military order to report for interrogation was in custody).  As a consequence, this order reasonably carried at least (and probably more than) what the Court of Military Appeals has described as the "subtle coercion," United States v. Schneider, 14 M.J. 189, 193 (C.M.A. 1982), and "subtle pressures," United States v. Ravenel, 26 M.J. 344, 348 (C.M.A. 1988), to speak with the representatives of authority that the judges of that court understand to be a significant restraint on the liberty of a member of the armed forces when questioned by military investigators about criminal activity.

It is indeed just the inherently coercive force of military organization implicated in questioning a service member that led Congress, years before Miranda, to reach the same conclusions that the Court of Military Appeals thus expressed about the subtle pressure or coercion to talk that comes with inquiry conducted through channels of the military structure.  The congressional response was a statutory requirement to warn of the

right to silence without regard to any "custody" test before a person operating under the Uniform Code of Military Justice may even request a statement from a suspect, 10 U.S.C. § 831(b), lest the statement be suppressed as evidence, § 831(d). See Schneider, 14 M.J. at 192-93. So it is fair to say that whenever a member of the services is questioned in circumstances mandated by a superior's order, he is in the situation that Miranda was meant to address, where the line between voluntary and involuntary response is at least so blurred that the Fifth Amendment guarantee is in jeopardy.

We accordingly infer that Rogers's situation at the house would have left any member of the armed services reasonably feeling that he lacked free choice to extricate himself, and sufficiently compelled to answer to authority. Rogers was thus in custody for purposes of Miranda, and for want of the required warnings his statements made at the house must be suppressed from use in the Government's case in chief in any prosecution.

Nor do we see a sufficient reason to treat the subsequent interrogation at the police station differently on the issue of custody. There was, to be sure, one new ingredient in the mix, prior to the warning of rights, in the statement from Ryan that Rogers was free to go. But we do not put much weight on that,

because Ryan also told Rogers that as a member of NCIS she was not answerable to his command at the Air Station; by emphasizing that she did not operate within the military command structure she tended to undercut the force of her advice that he was free to leave, which could reasonably have struck him as being contrary to his commander's order that placed him in police company to start with. It is in this way that the case differs from United States v. Baird, 851 F.2d 376 (D.C. Cir. 1988), where an assurance of freedom by a member of the Department of Transportation's Office of the Inspector General, with authority over the Coast Guard, could release a member of the Guard from an order of his military superior. Hence, we think the line between perceived freedom to leave without speaking and obligation to remain and respond is obscured here, as it was at the house, and conclude that Rogers was in custody subject to coercive influence to respond to questioning.

That conclusion brings with it the third issue. Although the content of the subsequent warnings of rights is not claimed to be inadequate to satisfy Miranda if warnings could be effective in the circumstances, the motion to suppress raises the issue of their efficacy. This issue, in turn, divides into two others, owing to the very fact that Rogers was questioned at length at the house without benefit of warnings and was soon questioned on the same subject after being warned. Seibert addressed this sequence, and under Justice Kennedy's controlling opinion a court confronted with

these facts must first determine the need for a special test for Miranda sufficiency, and apply it when called for.

If the pre-warning questions occurred in circumstances not clearly custodial, without manifesting a preplanned interrogation, and reflecting no policy to diminish the Miranda safeguards, the test for admissibility will be the familiar one. The sufficiency of warnings given after casual questioning and response, and the adequacy of a suspect's subsequent agreement to talk, will be examined under the usual standard of voluntary and knowing waiver of rights, and no further curative action by the police will be required for the admissibility of the subsequent statements despite the suppression of the earlier ones. Seibert, 542 U.S. at 620 (Kennedy, J., concurring); see Oregon v. Elstad, 470 U.S. 298 (1985). When, however, the police deliberately employ a sequence of unwarned questioning producing disclosures, followed by Miranda warnings, followed closely by similar questioning, the warnings will not be taken as sufficient without curative steps to demonstrate to a reasonable suspect that in practical terms he has a genuinely free choice to decline to speak in response to the subsequent questioning set to follow on the heels of his earlier responses. Seibert, 542 U.S. at 620-21 (Kennedy, J., concurring).

Here we think the record speaks with a fair measure of clarity in showing that the combined law enforcement authorities deliberately planned to subject Rogers to unwarned questioning

-12-

under conditions that would make it difficult for him to avoid them. They chose a time for executing the search warrant when Rogers would not normally be at home and arranged to have him sent where he would meet with the police by order of a superior military officer. As we have already mentioned, there was consequently a military compulsion behind Rogers's presence in the midst of the activity going on at his own house, which is fairly understood to carry with it that subtle coercion that the Court of Miliary Appeals has recognized when questioning occurs in a military setting without the congressionally mandated warnings. The fact that the Navy's own investigator (who took part in the later police station interrogation) refrained from joining in the questioning at the house prompts the supposition that she held back there lest she be required to give the statutory warning (along with a military version of the Miranda warnings). Instead, the conduct of the proceedings was left to the discretion of the state and local officers, whose calming representations to Rogers were punctuated with the advice that, "[t]oday's the day mister, today is the day." When the warnings were finally given at the police station, after Rogers had already made the basic incriminating statements, they were given in a way that tended to downplay the gravity of Rogers's situation. The warnings came not from the officers who had questioned him before, but from Ryan, the Naval investigator, who prefaced them with the suggestion that no warnings would have been

necessary at all but for the fact that an NCIS officer had to give cautionary statements that might not have been required of the regular police. She thus added one more to a succession of ambiguous signals, and it would be asking too much to claim that the course of events was coincidental. The adequacy of the warnings must therefore be assessed with attention to the need for curative action sufficient to apprise Rogers that despite the incriminating disclosures already given he had a genuine choice about speaking further with the police, as required by the controlling and plurality opinions in Seibert.

This requirement of a special test for the efficacy of the warnings was not, of course, reached by the district court, since any consideration of it was unnecessary owing to the court's conclusions on the custody issues. We have reached it, instead of remanding on it, because the basis for our conclusion is apparent in the portions of the record bearing on those questions of custody already reviewed. For the final step raised by the appeal, however, we think it would be prudent to remand the case to the trial court for a final determination whether the warnings could be effective in the circumstances.

So far as counsel before us have focuses attention on the record, the indications are that the warnings were not up to the task. Nothing points to any significant break or distinction between the invalid questioning at the house and the later

-14-

interrogation. While Ryan's participation might have signaled that a new proceeding was under way, presenting a genuine choice to talk or not, that view of events was ruled out by the continued presence of the other police who had asked Rogers to go to the station for more formal questioning, that is, for a more systematic interrogation on the subject then under discussion. There was only a very brief lapse of time between the last word at the house and the resumption at the police station, and nothing points to any advice to Rogers that he had the option of a fresh beginning because his prior statements could not be used against him.

But we are still wary of finally concluding here that adequate curative action was lacking, simply because the subject got too little attention before us. The briefs do not discuss the matter of cure and efficacy, the district court said nothing on the subject, and the oral argument before us did not address it with the thoroughness it deserves. Nor are we confident that the full record that might be relevant in considering this issue is before us, or even extant. We therefore remand to consider under Seibert whether the statement given at the police station should be suppressed along with the results of the preceding interrogation at the house. If the answer is no, the district court must determine whether the conviction may be sustained by application of the doctrine of harmless error; if yes, it must of course be vacated.

**Remanded**.