APPEL, Justice
(concurring in part and dissenting in part).
I concur with the balance of the majority opinion but dissent on the question of whether Schlitter was subjected to an unwarned interrogation contrary to Miranda v. Arizona under the United States and Iowa Constitutions. 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706-07 (1966).
I. Factual and Procedural Background.
The record reveals that law enforcement officers requested Schlitter to come to the state patrol office for questioning in connection with the death of his daughter. Schlitter drove himself to the station. He was then escorted to an interrogation room. The interrogation room had two steel desks. Schlitter sat in a chair with his back to the wall between the two desks. Two officers were in the interrogation room seated between Schlitter and the door. The door of the interrogation room was not locked. Schlitter was not advised at any time during the interrogation that the door was not locked, that he was not under arrest, or that he was free to go.
The interrogation began with basic background information. After a few minutes of questioning, however, the interrogation became accusatory. The interrogating officer asked about bruises on Schlitter’s daughter, stating that “none of the bruising shows up until she’s in your custody” and that Schlitter’s answer of “I don’t know” to questions about how the injuries occurred “doesn’t cut it.” The officer described the injuries and asked, “[H]ow does that happen ... did you do those things?” The officer repeatedly stressed, “[Wje’re down to two people, you and Amy (Schlitter’s girlfriend),” as responsible for the injuries to his daughter. And the officer also stressed that Schlitter had told them that “Amy’s a good mother [and he’d] never seen her be violent.” Schlitter grasped the point stating, “So, I’m pretty much incriminating myself.”
*401 For several minutes, the video recording of the interrogation reveals that the interrogating officer repeatedly confronted Schlitter and pressed him to admit responsibility for the injuries to his daughter. Under persistent questioning focusing on his responsibility for the injuries to his daughter, Schlitter finally declared, “Can you just stop?” The officer did not stop. He pressed on. He responded by aggressively stating, “But, but something happened. Okay? Something happened to your daughter.” Schlitter responded, “You’re getting too graphic and you’re getting. ...” But he was not allowed to finish his sentence when the officer interjected, “Something happened to your daughter and whatever happened to her, killed her.” Schlitter declared, “I don’t appreciate this!”
At this point, Schlitter asked, “Do I need my lawyer? Cause I don’t appreciate this.” The officer ignored him and observed, “We’re just trying to find out ... what happened.” Schlitter again declared he did not appreciate the questioning and for a second time announced, “We need to stop!” To this the officer responded, “One of two people did [it].” Schlitter for the third time stated, “I, we need to stop. Please.” The officer again ignored him and pressed on noting, “One of two people know what happened.”
At this point, Schlitter backed off his previous unqualified denials of any involvement in his daughter’s injuries. When asked once again whether he hurt his daughter, Schlitter now responded, “No. Not that I know of.” When asked what he meant by that, Schlitter responded with the phrase, “Not purposely trying to hurt my daughter.” When asked whether Schlitter became frustrated with his daughter on the day she went to the hospital with severe injuries, Schlitter now stated that his daughter was not eating lunch and that he “picked her up to set her down on her mat a few times, ‘cause she kept getting up.” Schlitter then stated, “[I]t wasn’t hard or extremely forceful. I picked her up, sat her down, and, uh, she did that enough times I had to take a break. Amy watched her for a few minutes.”
The officers continued the interrogation. They ultimately asked to trace Schlitter’s hand, suggesting that this technique would allow them to determine who caused bruising to his daughter’s face. In apparent reference to other bruises, Schlitter stated that he picked her up a lot “like that” but never violently. When asked if his actions would cause bruising, he stated, “Shouldn’t have been.”
The interrogation continued for several minutes. The interrogating officer stated, “[I]t’s you and Amy,” “it’s down to you two,” and “it’s down to you and Amy.”
At this point, the officers asked Schlitter if he would be willing to take a polygraph test. Schlitter asked if he could do it tomorrow, and the officers responded that they would prefer he do it that same day. When Schlitter answered, “I’m supposed to be having dinner soon,” an officer responded, “I think this is a bit more important than dinner right now.”
In response to the request for a polygraph test, Schlitter stated, “I wanna talk to my lawyer, too.” The officers allowed Schlitter to call his attorney. Schlitter could not reach her, however, and left a voice mail message'. After learning that Schlitter could not contact his attorney, the officers continued questioning. An officer pressed the polygraph issue, stating that “the choice is really yours.” Schlitter repeated, “I just wanna talk to my lawyer first ... about everything that is going on here.”
*402 The officers continued to press for the polygraph. One officer stated, “You can walk out of here knowing that, you know, we don’t think that you’re, you’re our person anymore....” Ultimately the officers and Schlitter agreed that he would come back the next day for the polygraph. An officer asked Schlitter, “Okay. I have your, your word?” and Schlitter responded, “Yeah, if that’s when you want me here, I’ll come back.” Schlitter stated that Amy was “too nice of a person to hurt any kid” The officer emphasized, • “[Ujntil we can polygraph you and, and talk with Amy .'., it won’t be' over.” The interrogation then ended.
II. State and Federal Claims.
In this case, Schlitter raises his Miranda claim under both the United States Constitution and the Iowa. Constitution. Although .the Iowa Constitution does not contain an explicit right against compelled self-incrimination, we have found such a right under the due process clause of the Iowa Constitution. State v. Iowa Dist. Ct., 801 N.W.2d 513, 518 n. 2 (Iowa 2011) (citing State v. Height, 117 Iowa 650, 659, 91 N.W. 935, 938 (1902)).
In the aftermath of Miranda, the United States Supreme Court has embraced its core holding but generally limited the potentially protean scope of the case. State supreme courts have not consistently followed the Supreme Court’s later caselaw under Miranda in the interpretation of their state constitutions.[3]
In this case, however, Schlitter does not suggest that we should apply a different framework under the Iowa Constitution than is generally applied by the United States Supreme Court. As a result, we must apply the federal framework for the purpose of this case, but we reserve the right to apply the federal framework in a more restrictive manner. See State. v. Short, 851 N.W.2d 474, 491 (Iowa 2014). Under these circumstances, this case does not stand for the proposition that departures from federal precedent will be rejected, but only that they have not been presented and therefore have not been ruled upon in the case presented.
Thus, the posture presented in this case is similar to State v. Pals, 805 N.W.2d 767 (Iowa. 2011). In Pals, we considered the application . of a totality-of-the-circumstances test to determine whether an individual had consented to a< search,- Id. at 777. Pals ■ did not argue- for a departure from the -federal totality-of-the-circumstances test under the Iowa Constitution. Id. at 779-80. Consequently, we utilized the federal test, but applied it in a fashion *403 more stringent than federal law. Id. at 782. Similarly, here we are faced with another totality-of-the-circumstances test under federal law. We apply the test, but may do so in a fashion at variance with federal law.
III. Legal Framework for Evaluation of Custody Under United States Constitution.
As noted by the majority, the United States Supreme Court has established a totality-of-the-eircumstanees test to determine if a person is in custody or if freedom is deprived “in any significant way.”[4] Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706, Whether a person is in custody or has been deprived of freedom in any significant way is determined' by examination of “all of the circumstances surrounding the interrogation.” Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528-29, 128 L.Ed.2d 293, 298 (1994). The Supreme Court has stated that relevant circumstances include, but are not limited to: the language used in summoning the interrogatee, Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 2149, 158 L.Ed.2d 938, 951 (2004); the location of the questioning, see Maryland v. Shatzer, 559 U.S. 98, 114, 130 S.Ct. 1213, 1225, 175 L.Ed.2d 1045, 1059 (2010); its duration, Berkemer v. McCarty, 468 U.S. 420, 437-38, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317, 333 (1984); statements made during the interrogation, Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct 711, 714, 50 L.Ed.2d 714, 719 (1977) (per curiam); the presence or absence of physical restraints during the questioning, New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 556 (1984); and whether the interrogatee is released at the end of the questioning, California v. Beheler, 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275, 1278-79 (1983) (per curiam).
Following the lead of the United States Supreme Court; several circuit courts have developed nonexclusive criteria for consideration. See United States v. Kim, 292 F.3d 969, 974 (9th Cir.2002) (including “(1) the language used to summon individual; (2) the extent to which the defendant is confronted with évidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual” (quoting United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir.2001))); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990) (including “whether the süspect was informed at time of questioning that the questioning was voluntary, that the suspect was free to leave or request officers to do -so, or that the suspect was- not considered under arrest”; “whether the suspect [had] unrestrained freedom of movement during questioning”; “whether the suspect initiated the contact with authorities, or voluntarily acquiesced to official requests to respond to questions”; “whether strong arm tactics or deceptive stratagems were employed during the questioning”; “whether the atmosphere of the questioning was police dominated”; or “whether the suspect was placed under arrest at the.termination of the questioning?-)- We have also utilized nonexclusive criteria for determination of custody. State v. Miranda, 672 N.W.2d 753, 759 (Iowa 2003) (including, “language used to summon the person”; “purpose, place, and manner of interrogation”; “extent.to which the person is confronted with *404 evidence of guilt”; and “whether the person is free to leave the place of questioning”).
An individual is in custody when freedom of movement is restrained to the degree comparable to formal arrest. Beheler, 463 U.S. at 1125, 103 S.Ct. at 3520, 77 L.Ed.2d at 1279. The question of custody is sometimes phrased as whether there are circumstances that objectively present “a serious danger of coercion” — coercion of a degree associated with , formal arrest. Howes v. Fields, 665 U.S.-,-, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17, 27 (2012); Tammy R. Pettinato, The Custody Catch-22: Post-Interrogation Release as a Factor in Determining Miranda Custody, 65 Ark. L. Rev. 799, 818 n. 115 (2012); Bryan Taylor, You Have the Right , to Be Confused! Understanding Miranda After 50 Years, 36 Pace L. Rev. 160, 180-81 (2015).
As noted by the United States Supreme Court, coercion inherent in custodial interrogations “derives in large measure from an interrogator’s insinuations that the interrogation will continue until a confession is obtained.” Minnesota v. Murphy, 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409, 423 (1984); see also State v. Muntean, 189 Vt. 50, 12 A.3d 518, 525 (2010) (finding custody is present when individual is not “at liberty to terminate the interview and leave”). As observed by one authority, custody “implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation.” Stephen E. Arthur & Robert S. Hunter, The Miranda Rights, in 1 Federal Trial Handbook: Criminal § 30:8 (4th ed.), Westlaw (database updated Dec.- 2015).
The United States Supreme Court has emphasized that in determining the custody issue, the question must be approached from the viewpoint of a reasonable person in the presence of the police officer, not from the viewpoint of police officers themselves. Yarborough, 541 U.S. at 663, 124 S.Ct. at 2148-49, 158 L.Ed.2d at 950-51; Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383, 394 (1995); Stansbury, 511 U.S. at 323, 114 S.Ct. at 1529, 128 L.Ed.2d at 298; Berkemer, 468 U.S. at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. The subjective and undisclosed views of police officers conducting the interrogation are irrelevant. Stansbury, 511 U.S. at 324, 114 S.Ct. at 1529-30, 128 L.Ed.2d at 299-300. The views of officers are relevant only to the extent conveyed, by word or deed, to the individual being questioned. Id. at 325, 114 S.Ct. at 1530, 128 L.Ed.2d at 300.
IV. Application of Totality-of-the-Circumstances Test of Custody.
A. Language Used to Summon: The Question of Implied Obligation. We begin by discussing the first nonexclusive factor often cited in determining custody or restraint: the language used by the police to summon an individual to interrogation. Yarborough, 541 U.S. at 664, 124 S.Ct. at 2149, 158 L.Ed.2d at 951. As has been noted by a leading authority, “ ‘invitations’ or ‘requests’ to come to the police station for questioning may be ambiguous.” William E. Ringel et al., Searches and Seizures, Arrests and Confessions, § 27.5 (2d ed.), Westlaw (database updated Mar. 2016).
Here, however, the record does not provide the language used to summon Schlit-ter. The officer testified at the suppression hearing only that a request was made that Schlitter come to the patrol office and that he voluntarily complied. There was no evidence the officer specifically advised Schlitter that his decision was up to him, that he could leave at any time during the interrogation if he chose, or that he was not under arrest. Yet, it is clear under the caselaw that even when a person ap *405 pears to have voluntarily traveled to a police station to submit to interrogation, this fact does not in and of itself establish lack of custody or restraint for á number of reasons.
First, a request to appear at the police station “may easily carry an implication of obligation, while the appearance itself; unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen.” Jefferson v. State, 217 Ga.App. 747, 459 S.E.2d 173, 177 (1995) (quoting Dunaway v. New York, 442 U.S. 200, 207 n. 6, 99 S.Ct. 2248, 2253 n. 6, 60 L.Ed.2d 824, 832 n. 6 (1979)) (noting an officer’s request for a person to come to the station may easily be an offer that cannot be refused, depending on the circumstances); State v. Menne, 380 So.2d 14, 17 (La.1980); State v. Bleyl, 435 A.2d 1349, 1357 (Me.1981); People v. Dross, 146 Misc.2d 783, 551 N.Y.S.2d 1016, 1020 (Supp.Ct.1989). The United States Supreme Court recognized the concern in Dunaway, where the Supreme Court recognized that individuals may not view requests to come to the station as something that they may easily refuse. 442 U.S. at 207 n. 6, 99 S.Ct. at 2253 n. 6, 60 L.Ed.2d at 832 n. 6. Thus, even an apparently voluntary appearance may mask coercive features.
Second, many of the cases finding the manner of arrival at the police station significant combine the voluntary nature of the summons with other facts that reinforce a finding of lack of custody or restraint.. That was the case in Mathiason, In Mathiason, the defendant was told upon his arrival at the police station that he was not under arrest, 429 U.S. at 493, 495, 97 S.Ct. at 713, 714, 50 L.Ed.2d at 718, 719. This key limiting feature of Mathiason — namely, that other facts supported a finding of lack of custody beyond the apparently voluntary arrival of the person at the place of interrogation — has not gone unnoticed. For example, in Muntean, a defendant who voluntarily arrived at the place of interrogation was nevertheless found to be in custody when he was not told that he was free to leave at any time, he was confronted immediately with evidence of guilt, the detective indicated that he was certain of his guilt, and the interrogation took place in a small, windowless polygraph room. 12 A.3d at 524.
Similarly, in Moore v. Ballone, the United States Court of Appeals for the Fourth Circuit noted the fact that the police emphasized that the individual was not under arrest at the station before the interrogation commenced in Mathiason limited the scope of the case. 658 F.2d 218, 225 (4th Cir.1981). Along the same line of reasoning, the court in United States v. Harrold noted that although courts have held that an individual who voluntarily arrived at the police station- was not in custody for purposes of Miranda, the defendants “in those cases were-also told that they were not under arrest or were not restrained at the police station.” 679 F.Supp.2d 1336, 1345 (N.D. Ga. 2009) (emphasis added). Further, as has been observed by one federal court, the repeated reminder that the suspect is free to leave is perhaps the most significant fact for determining if the interrogation is noncustodial. United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir.2004). Notably, here there was no Mathiason-reminder, let alone repeated Crawford reminders that.Schlitter was not under arrest or was free to leave the interrogation location.
Finally, an' interrogation that -commences as a noncustodial interrogation can morph into a situation that a reasonable person would conclude involves custody or significant restraint. The usual fact pattern involves an interrogation that begins in a low-key -manner but then escalates *406 into a confrontation suggesting the defendant’s guilt. In these situations, an interrogation may be voluntary at the beginning but may develop into a confrontation that would give rise to a reasonable belief that the defendant cannot leave until the interrogation is completed. See, e.g., United States v. IMM, 747 F.3d 754, 766 (9th Cir.2014) (noting voluntary initial contact is significant but does not end custody inquiry); People v. Algien, 180 Colo, 1, 501 P.2d 468, 470-71 (1972); People v, Mrozek, 52 Ill.App,3d 500, 10 Ill.Dec. 330, 367 N.E.2d 783, 787 (1977); Commonwealth v. Magee, 423 Mass. 381, 668 N.E.2d 339, 343 (1996); State v. Payne, 149 S.W.3d 20, 33-34 (Tenn.2004),
Under the thin record of this case, the conclusory testimony that Schlitter voluntarily came to the station mildly supports a finding of lack of -custody. The-lack of evidence of the specific language used, however, and the failure of the record to show that Schlitter was told he could voluntarily leave or end the interrogation substantially minimizes the importance of this factor. Further, as will be seen below, 'developments at the interrogation substantially overpower the voluntary nature of the-original summons. '
B. Ensuring Voluntariness: Statement That the Individual Is Free to Leave. A second factor often considered in determining whether an interrogation is custodial is whether the interrogatee has been told that he is not under arrest or that he is free to go at any time. The authorities discussed above demonstrate the importance of these admonitions. The Eighth Circuit has observed that
abundant advice of freedom to terminate the encounter should not be treated merely as- one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood' himself to- be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview.
United States v. Czichray, 378 F.3d 822, 826 (8th Cir.2004).
Here, however, the transcript and the audio recording of Schlitter’s interrogation reveal no such declarations. Although not necessarily determinative, the lack of a statement that Schlitter was not under arrest and was free to terminate the interrogation at any time is a factor cutting in favor of custody. See United States v. Conder, 529 Fed.Appx. 618, 623 (6th Cir.2013).
Even in cases when a person is advised that he or she is free to terminate the interrogation at any time, such declarations are not determinative of the custody issue when the interrogation turns strongly accusatorial. California v. Aguilera, 51 Cal.App.4th 1151, 59 Cal.Rptr.2d 587, 593-94 (1996) (holding that although the inter-: rogatee was told he was not in custody, repeated disbelief expressed by the interrogators indicated that the individual would not be released so long as the individual continued denials). While police in this case made no statement at the time of the interrogation suggesting that Schlitter was not under arrest or was free to leave, they did repeatedly question him in a way that demonstrated disbelief, a factor cutting in favor of a finding of custody. See, e.g., Jones v. People, 711 P.2d 1270, 1276 (Colo.1986); State v. Rogers, 277 Neb. 37, 760 N.W.2d 35, 56-57 (2009).
C. Place of - Interrogation: Is It Police Dominated? A third factor considered in determining whether an interrogation is custodial is the place of interrogation. ; -As noted in Miranda, “compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official *407 investigations, where there are often impartial observers to guard'against'intimidation or trickery.” 384 U.S. at 461, 86 S.Ct. at 1621, 16 L.Ed.2d at 716. According to Miranda, in the investigator's office, the investigator possesses all the advantages; “[t]he atmosphere suggests the invincibility of the forces of the law.” Id. at 450, 86 S.Ct. at 1615, 16 L.Ed.2d at 709. As a result, courts have noted that stationhóuse interrogations should be scrutinized with great care. United States v. Jacobs, 431 F.3d 99, 105 (3rd Cir.2005); Steigler v. Anderson, 496 F.2d 793, 799 (3rd Cir.1974).
Here, the interrogation not only occurred at the patrol office,, but in a room specially designed for that purpose. Schlitter was positioned with his back to the. wall, surrounded by two steel desks, with two officers, in front of him. A review of the videotaped interrogation shows that the physical characteristics of the interrogation room and the placement of the officers plainly tends to promote the type of police dominated atmosphere that animated the concerns of Miranda.
The State notes, that the door to the room was unlocked. Yet, theré is nothing in the record that suggests that Schlitter was told that fact. See United States v. Rogers, 659 F.3d 74, 76 (1st Cir.2011) (describing how police told the suspect that the door was unlocked and he was free to leave the interview room); People v. Vargas, 109 A.D.3d 1143, 971 N.Y.S.2d 624, 625 (2013) (hoting that the suspect was told that the doors were unlocked, and she could leave whenever she wanted). In any event, two officers in a small room blocking access to the door minimizes the fact that the door was unlocked. See Payne, 149 S.W.3d at 33 (noting that police officers blocked access to the door of interrogation room); see also People v. Elmarr, 181 P.3d 1157, 1163-64 (Colo.2008) (stating the fact that the suspect was “interrogated in a small, closed-door -interview room” by police officers contributed to a finding of custody); Ramirez v. State, 739 So.2d 568, 574 (Fla.1999) (finding custody established when accused was, among other' things, questioned “in ⅛ small room'in the police station by two detectives”). In Harrold, the'district court noted the fact that the door to the interrogation room was unlocked, but did not give this factor much weight under circumstances similar to those presented ' in this case. 679 F.Supp.2d at 1344.
The location and physical circumstances surrounding the interrogation in this ease point in a direction of finding custody or restraint. Yet, though there is an element of compulsion in the setting, the United States Supreme Court has made clear that the mere fact that an interrogation occurs at the police station is not, in and of itself, determinative of the question of custody or restraint. Mathiason, 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719. But nothing in Mathiason indicates the' station house location should not be considered as a factor in the overall analysis of whether custody or restraint is present. .
D. Nature of Interrogation: Is It Ac-cusatorial? Another important factor to consider in determining the custody or restraint question is the nature of the interrogation. In -many cases, the evolution of interrogation from ordinary fact-finding into a highly confrontational and accusato-rial proceeding converts a voluntary encounter into a custodial interrogation. See Ross v. State, 45 So.3d 403, 415-16 (Fla.2010). When interrogation escalates, the key question is whether a reasonable person would feel at the time of the accusato-rial questioning that they would-be free to leave. People v. Payne, 41 A.D.3d 512, 838 N.Y.S.2d 123, 125 (2007).
*408 Illustrative of accusatory questioning is State v. Lynn, 829 S.W.2d 553 (Mo.Ct.App.1992). In this case, the investigation focused on defendant and her boyfriend as perpetrators of the crime. Id. at 554. When the police continued the questioning of the defendant despite her denials until she confessed, the Missouri court held the defendant reasonably believed she was not free to go. Id.; see also Mansfield v. State, 758 So.2d 636, 644 (Fla.2000) (finding custody when accused “was interrogated by three detectives at the police station, he was never told he was free to leave, he was confronted with evidence strongly suggesting his guilt, and he was asked questions that made it readily apparent that the detectives considered him the prime, if not the only, suspect”).
It is clear that an interrogation can be accusatorial even if there is not probable cause to arrest the individual. In Moore, the Fourth Circuit noted that even though law enforcement did not have probable cause to arrest an individual and told him he was free to leave, a persistent course of interrogation nonetheless produced a coercive environment sufficient to satisfy the custody requirement of Miranda. Moore, 658 F.2d at 221; see also State v. Mumbaugh, 107 Ariz. 589, 491 P.2d 443, 449 (1971) (stating that a finding of no probable cause does not necessarily mean there was no “custody” for purposes of Miranda). Probable cause to arrest and custody are different concepts. Lindsay v. State, 698 P.2d 659, 662-63 (Alaska Ct.App.1985) (finding the defendant in custody though no probable cause to arrest); People v. Biggs, 88 A.D.2d 960, 451 N.Y.S.2d 196, 199 (1982) (finding subject in custody in police car though no probable cause to arrest him). The proper focus is not on the subjective views of the police or the strength or weaknesses of their case, but is instead on whether a reasonable person in the shoes of the person being interrogated would believe he or she could terminate the interrogation and leave.
Once again, the United States Supreme Court has cautioned that mere investigatory questioning is not enough to dictate a finding of custody or restraint. See Berkemer, 468 U.S. at 437-38, 104 S.Ct. at 3149, 82 L.Ed.2d at 333 (noting that questioning incident to an ordinary traffic stop is different than custodial questioning). Yet, the nature of the questioning is an important factor in the analysis. United States v. Bassignani, 575 F.3d 879, 885 (9th Cir.2009) (discussing the difference between confrontational and nonconfronta-tional interrogation).
Here, there is no question the interrogation began in a low-key, matter-of-fact manner. It also escalated into confrontation. The tone of the interrogation shifted, and law enforcement repeatedly sought a confession from Schlitter. Further, when Schlitter unambiguously demanded the officers to stop the interrogation, they did the opposite. They persisted. He specifically asked the officers to stop three times and declared the interrogation inappropriate four times. The officers ignored his entreaties and plowed ahead. See State v. Roble-Baker, 340 Or. 631, 136 P.3d 22, 29-30 (2006) (en banc) (noting refusal of police to stop questioning when requested to do so created the kind of police-dominated atmosphere that Miranda warnings were intended to counteract).
Ultimately, they pressured Schlitter to qualify his previous unqualified strong denials by stating that he did not hurt his daughter “as far as he knew” and declaring that he was frustrated with his daughter’s behavior and picked her up and down repeatedly during the time when the injuries might have been inflicted on her. The accusatorial nature of the interrogation is *409 a factor that cuts in favor of a finding of custody.
The district court responded to these facts by crediting patrol officers who testified that they were conducting an interrogation for the purposes of background information. The district court found that the officers had no plans to take Schlitter into custody because there was no evidence with which to charge him with a crime.
The subjective views of the police officers have no direct bearing on what a reasonable person would conclude from the circumstances. Stansbury, 511 U.S. at 324, 114 S.Ct. at 1529-30, 128 L.Ed.2d at 299-300, Miranda rights are personal to the individual. That is why the test is what a reasonable person in the shoes of the person being interrogated would believe with respect to the custodial issue. The subjective belief on custody of the police officer, unless communicated to the individual being questioned, is of very little value in determining what a reasonable interrogatee would believe. State v. Murray, 510 N.W.2d 107, 110 (N.D.1994) (stating the fact that the officer planned to arrest the accused irrelevant when not communicated to the accused). Here, there was no such communication and indeed, just the opposite in light of the officer’s declarations that the bruising occurred when his daughter was in his care. Thus, the trial court’s focus on the subjective state of mind of police officers does nothing to mitigate the accusatorial nature of the interrogation.
E. Honoring Request to Call Attorney About Polygraph Examination After Conclusion of Interrogation. Another factor in this case is the significance of the officers honoring Schlitter’s request that he be allowed to call his attorney when his interrogators wanted to conduct a polygraph test. Yet, by the time the officers asked for a polygraph test, the interrogation was essentially over.[5] The officers had achieved all they could from the interrogation of Schlitter. The question here is whether Schlitter felt free to leave at the time the questioning turned accusatorial at the patrol office in the environment in which he found himself. The fact that he repeatedly asked the interrogators to stop asking him questions — and their determination to press on — suggests that at the key point of the interrogation, a reasonable person in Schlitter’s shoes would not have believed he was free to leave the interrogation room. He repeatedly asked the officers to stop, and his requests were repeatedly not honored. The officers appeared determined to press the interrogation, and at the accusatorial point of the questioning, a reasonable person might not have believed they could just get up and leave until the interrogation was concluded.
F. Departure at Conclusion of Interrogation. Another feature of this case emphasized by the State is that Schlitter was not arrested at the conclusion of the interrogation. In Mathiason, the individual who confessed was not charged at the conclusion of the questioning, a fact that the Supreme Court found significant. 429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d at 719. But in Mathiason, the suspect was told he was not under arrest at the beginning of the interrogation, confessed within about five minutes, and there was “no indication that the questioning took place in a context where respondent’s freedom to de *410 part was restricted in any way.” Id. at 493, 495, 97 S.Ct. at 713, 714, 50 L.Ed.2d at 718, 719. Here, a suspect is not told he is not under arrest or that he can terminate the'interrogation, is placed in a confined room used for interrogations, has his exit blocked by patrol officers, is confronted with accusatorial questioning, and is subject to repeated and determined questioning in response to three unheeded demands that the interrogation “stop!” The facts are obviously in strong contrast to those in Mathiason.
Further, the fact that Schlitter was not charged for another fifteen months is of little moment on the question of what Schlitter reasonably thought ai the time of the accusatorial interrogation. Again, the question is not what the police may have thought after the interrogation was concluded (or at any time, for that matter): the question is what would a reasonable person hi Schlitter’s position have concluded about his custodial status at the time he faced accusatorial interrogation and made repeated unheeded demands to stop the interrogation. See State v. Aynes, 715 N.E.2d 945, 950 (Ind.Ct.App.1999) (finding despite fact that defendant drove himself to police station for interrogation and left at end, interrogation was custodial in light of nature of interrogation and fact that defendant was never told he was free to leave).
G. Conclusion. In light of the totality of the circumstances, I conclude that the interrogation here became custodial when law enforcement officers began focusing in on Schlitter as the possible perpetrator of the crime in this case. I note in particular the failure of law enforcement to advise Schlitter that he was not under arrést, the physical circumstances of the interrogation, the confrontational nature of the questioning by police, and importantly, the refusal of the officers to discontinue the questioning when Schlitter repeatedly demanded that they stop. After his repeated requests to stop were not honored, a reasonable person would have believed he was not free to terminate the interrogation. I would ■ thus hold that the district court erred in failing to suppress statements made' beyond that point in the interrogation tinder both the United States Constitution and under the due process'clause of article I, section 9 of the Iowa Constitution.
V. . Harmless Error.
Constitutional error is harmless only if it may be shown to be harmless beyond a reasonable doubt. State v. Turner, 630 N.W.2d 601, 609 (Iowa 2001). The record in this casé shows, however, that the prosecutor used Schlitter’s interrogation responses to persuade the jury of his guilt. An incriminating response is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. Rhode Island v. Innis, 446 U.S. 291, 297, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297, 305 (1980). At trial, the prosecutor emphasized Schlitter’s lack of “outrage” in the interrogation. Further, the prosecutor additionally emphasized in closing argument to the jury that in the interrogation Schlitter .admitted ■ abusing his. daughter when he stated that he was frustrated with her on Sunday, March 21, because she was not eating her lunch. The prosecutor also argued that in the interrogation Schlitter admitted that he might have picked up his daughter in a rough manner. In a close case like this one, we cannot say that the admission of evidence from the interrogation was harmless given the reliance placed on the evidence obtained after the March 30 interrogation turned adversarial by the prosecution. As a result, Schlitter’s motion to suppress incriminating state *411 ments made after the interrogation turned adversarial should have been granted.[6]
WIGGINS and HECHT, JJ., join this concurrence in -part and dissent in part.

. See, e.g., State v. Ketchum, 97 Hawai'i 107, 34 P.3d 1006, 1021-25 (2001) (elaborating on a móre expansive definition of custody under article I, section 10 of the Hawaii Constitution); People v. Griggs, 152 Ill.2d 1, 178 Ill.Dec. 1, 604 N.E.2d 257, 268 (1992) (rejecting Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89. L.Ed.2d 410 (1986), under the Illinois Constitution); Commonwealth v. Smith, 412 Mass. 823, 593 N.E.2d 1288, 1295 (1992) (declining to follow Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), on state law'grounds in Massachusetts); State v. Smith, 834 S.W.2d 915, 919 (Tenn.1992) (explaining that the Tennessee Constitution provides more protection than the Federal Constitution under Miranda); see also State v. Tyler, 867 N.W.2d 136, 186-87 (Iowa 2015) (Appel, J., concurring part and dissenting in part) (citing state constitutional cases that decline to follow Elstad)-. Claudia R, Barbieri, Oregon v. Elstad Revisited: Urging State Court Judges to Depart from the U.S. Supreme Court’s Narrowing of Miranda, 4 U. Dist. Co-lum. L. Rev. 63, 69-74 (1998); Arthur Leavens, ■Prophylactic Rutes and State Constitutionalism,. 44 Suffolk U.L. Rev. 415, 429-38 (201-1); Katherine E. McMahon, “Cat-Out-of-the-Bag” & "Break-in-the-Stream-of-Events”: Massachusetts' Rejection of Oregon v. Elstad for Suppression of "Warned Statements Made After a Miranda Violation, 20 W. New Eng. L. Rev, 173, 201-08 (1998).

. The expansive language is broad enough to prevent law enforcement from circumventing the Miranda requirements by conducting interrogations in places such as hotel rooms or squad cars. See Orozco v. Texas, 394 U.S. 324, 326-27, 89 S.Ct. 1095, 1097, 22 L.Ed.2d 311, 314-15 (1969).

. Schlitter also invoked his right to counsel generally. The law enforcement officers refused to terminate the questioning, however, giving rise to a potential violation of Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378, 384 (1981). This Edwards question was not raised in this case.

. As a result of my disposition of the custody issue, it is not necessary to consider Schlit-tfer’s due process claim that the statements were involuntary.